**[J-121B-2016]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 47 MAP 2016 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court at No. 2169 MDA 2014 dated |
| | : | August 7, 2015 Affirming the Order of |
| v. | : | the Court of Common Pleas of |
| | : | Cumberland County, Criminal Division, |
| | : | at No. CP-21-CR-0000903-2006 dated |
| JOSE M. MUNIZ, | : | October 14, 2014. |
| | : | |
| Appellant | : | ARGUED:  December 6, 2016 |

*Justice Dougherty delivers the Opinion of the Court with respect to Parts I through IV and VII, and announces the Judgment of the Court. The Opinion is joined in full by Justices Baer and Donohue, and by Justices Todd and Wecht with the exception of Parts V and VI.  Justice Wecht files a concurring opinion in which Justice Todd joins. Chief Justice Saylor files a dissenting opinion.*

## OPINION ANNOUNCING THE JUDGMENT OF THE COURT

**JUSTICE DOUGHERTY**                                      **DECIDED:  July 19, 2017**

We granted discretionary review to determine whether Pennsylvania's Sex Offender Registration and Notification Act (SORNA), 42 Pa.C.S. §§9799.10-9799.41, as applied retroactively to appellant Jose M. Muniz, is unconstitutional under the ex post facto clauses of the United States and Pennsylvania Constitutions.[1]  The Superior Court

---

[1] Article I, Section 10 of the United States Constitution provides, in pertinent part: "No State shall … pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts, or grant any Title of Nobility."  U.S. CONST., art. I, §10.

(continued…)

held SORNA's registration provisions are not punishment, and therefore retroactive application to appellant, who was convicted of sex offenses prior to SORNA's effective date but sentenced afterwards, does not violate either the federal or state ex post facto clauses. For the following reasons, we reverse and hold: 1) SORNA's registration provisions constitute punishment notwithstanding the General Assembly's identification of the provisions as nonpunitive; 2) retroactive application of SORNA's registration provisions violates the federal ex post facto clause; and 3) retroactive application of SORNA's registration provisions also violates the ex post facto clause of the Pennsylvania Constitution.

## I. Procedural History Related to Current Appeal

On February 7, 2007, after a bench trial in Cumberland County, appellant was convicted of two counts of indecent assault arising out of an incident where he touched the breasts of his girlfriend's twelve-year old daughter.[2] Sentencing was scheduled for May 8, 2007, at which time appellant would have been ordered to register as a sex offender with the Pennsylvania State Police for a period of ten years pursuant to then-effective Megan's Law III. *See* 42 Pa.C.S. §9795.1 (expired). However, appellant failed to appear for his sentencing hearing and absconded until he was apprehended on unrelated charges in Rhode Island in September 2014. N.T., 10/14/14 at 2. During his

---

(…continued)
Article I, Section 17 of the Pennsylvania Constitution provides: "No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed." PA. CONST., art. I, §17.

[2] *See* 18 Pa.C.S. §§3126(a)(1) (person is guilty of indecent assault if he has indecent contact with the complainant for purpose of arousing sexual desire in himself or complainant, without complainant's consent), 3126(a)(7) (complainant less than 13 years of age).

absence, the General Assembly had replaced Megan's Law III with SORNA. Under SORNA, persons convicted of indecent assault of a person less than thirteen years of age, 18 Pa.C.S. §3126(a)(7), are categorized as Tier III offenders and are required to register as sex offenders for the remainder of their lives.[3] Accordingly, appellant was sentenced to four to fourteen months' imprisonment and ordered to comply with lifetime registration requirements under SORNA. Appellant filed a post-sentence motion seeking application of the ten-year registration period under Megan's Law III, which was the law in place at the time of his offense and conviction, instead of lifetime registration under SORNA. The court denied appellant's motion and he appealed to the Superior Court, claiming retroactive application of SORNA violates the ex post facto clauses of the United States and Pennsylvania Constitutions, and the reputation clause of the Pennsylvania Constitution.[4]

The Superior Court affirmed the ruling of the trial court in a three-page unpublished memorandum opinion. *Commonwealth v. Muniz*, No. 2169 MDA 2014, unpublished memorandum (Pa. Super. filed August 7, 2015). The panel opined *Commonwealth v. Perez*, 97 A.3d 747 (Pa. Super. 2014), directed its holding "the new registration regime pursuant to SORNA is constitutional under the Federal and State Ex Post Facto Clauses." *Muniz*, slip op. at 3, *quoting Perez*, 97 A.3d at 760 (SORNA is not

---

[3] Appellant's seven year absence from the Commonwealth is of no moment. SORNA applies retroactively to any individual serving a sentence for a sexual offense or any individual who had not completed their registration period under prior registration statutes as of SORNA's effective date of December 20, 2012. 42 Pa.C.S. §9799.13. Had appellant been sentenced in 2007 and subject to registration under Megan's Law III, he would not have completed his ten-year registration period when SORNA became effective and thus his ten-year registration period would have been converted to a term of lifetime registration.

[4] PA. CONST. art. I §1 ("All men … have certain inherent and indefeasible rights, among which are those of … protecting property and reputation. ...").

punitive; retroactive application does not violate federal ex post facto clause).[5] The panel further held appellant waived his reputation clause claim by failing to raise it in his post-sentence motion.

Appellant filed a petition for allowance of appeal raising two questions regarding SORNA's "sexual offenses and tier system" provisions set forth at 42 Pa.C.S. §9799.14:

> 1) Does applying [42 Pa.C.S. § 9799.14] retroactively violate the Federal Constitution?
>
> 2) Does applying [42 Pa.C.S. § 9799.14] retroactively violate the Pennsylvania Constitution?

This Court granted review of both questions. *Commonwealth v. Muniz*, 135 A.3d 178 (Pa. 2016).

## II. Summary of Arguments and Applicable Standards of Review

Briefly, appellant argues SORNA unconstitutionally increases the length of registration and notification requirements for sex offenders subject to its retroactive application. Appellant claims despite the General Assembly's declaration SORNA is not to be construed as punitive, the statute's text and structure make clear the legislative objective was to punish. Appellant asserts SORNA is so punitive in purpose and effect that the General Assembly's intent to deem it civil is undermined. Thus, appellant claims, SORNA increases punishment for conduct which occurred before its enactment and such retroactive application violates both federal and state constitutional bans on ex post facto laws; in doing so, appellant argues the Pennsylvania Constitution provides

---

[5] The panel did not explain that, in *Perez*, the Superior Court did not actually reach the merits of the state constitutional claim, holding instead it was waived for failure to present an analysis under *Commonwealth v. Edmunds*, 586 A.2d 887 (Pa. 1991). *See Perez*, 97 A.3d at 760.

greater protection than the United States Constitution. Appellant argues SORNA is therefore unconstitutional as applied to someone like him whose conviction predated its enactment.[6]

In response, the Commonwealth argues the decision of the United States Supreme Court in *Smith v. Doe*, 538 U.S. 84 (2003), and an analysis of the factors set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), both direct SORNA is not punishment, and thus there can be no ex post facto violation. The Commonwealth focuses on the General Assembly's aim to address the "major public concern" of recidivism among adult sex offenders and indicates SORNA's terms are not excessive given this legislative purpose.[7]

As we consider the parties' arguments in more detail below, we recognize there is a general presumption that all lawfully enacted statutes are constitutional.

---

[6] The Defender Association of Philadelphia and the Pennsylvania Association of Criminal Defense Lawyers (hereinafter referred to jointly as PACDL) filed an *amicus curiae* brief supporting appellant. *Amicus* briefs in support of appellant were also filed by The Association for the Treatment of Sexual Abusers, Assessment and Treatment Alternatives and the Joseph J. Peters Institute, The Collateral Consequences Resource Center, and The Social Science Scholars; these policy based briefs focused on studies which opined recidivism by sex offenders is overstated and sex offender registration is ineffective and may also be counterproductive. The Pennsylvania District Attorneys Association (PDAA) filed an *amicus* brief in support of the Commonwealth.

[7] The Commonwealth also claims appellant waived his argument that SORNA violates the reputation clause of the Pennsylvania Constitution. We note the Superior Court correctly concluded the issue was waived because it was not raised in appellant's post-sentence motion, and appellant has not raised an independent reputation clause claim before this Court. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). However, appellant does include reputation-based concerns in his analysis of Pennsylvania's ex post facto clause, and whether it provides greater protection than its federal counterpart; appellant presented almost identical reputation-based arguments in his *Edmunds* analysis before the Superior Court as well. To the extent reputation-based concerns support appellant's claim that SORNA's provisions are punishment and retroactive application is a violation of Pennsylvania's ex post facto clause, we consider them only in that limited context.

*Commonwealth v. Lee*, 935 A.2d 865, 876 (Pa. 2007). In addition, as this case presents questions of law, our scope of review is plenary and we review the lower courts' legal determinations *de novo*. *Id.*

### III. Ex Post Facto Laws Generally

Before turning to the history of Pennsylvania sex offender laws and the specific provisions of SORNA at issue in this appeal, we first explain the general purpose of ex post facto prohibitions. The central concern in incorporating ex post facto clauses in both federal and state constitutions was to "assure that federal and state legislatures were restrained from enacting arbitrary or vindictive legislation" following the American Revolution. *Miller v. Florida*, 482 U.S. 423, 429 (1987), *citing Calder v. Bull*, 3 U.S. 386, 391 (1798). However, as noted by Chief Justice Chase in *Calder*, the term ex post facto "had been in use long before the Revolution." *Calder*, 3 U.S. at 391. The clauses were thus also directed at the separate concern, relevant here, that individuals are entitled to "fair warning" about what constitutes criminal conduct, and what the punishments for that conduct entail. *Miller*, 482 U.S. at 430; *see also Commonwealth v. Rose*, 127 A.3d 794, 805 (Pa. 2015), *quoting* WAYNE R. LAFAVE, CRIMINAL LAW 116, 121 (5th ed. 2010). The United States Supreme Court, in *Weaver v. Graham*, 450 U.S. 24 (1981), succinctly articulated this idea in stating, "Critical to relief under the *Ex Post Facto* Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." *Id*. at 30. Based on both these concerns, Chief Justice Chase set out four categories of laws that violate such prohibitions:

> 1st. Every law that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action. 2nd. Every law that aggravates a crime, or makes it greater than it was, when committed. 3rd. Every law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and

receives less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.

*Calder*, 3 U.S. at 390. Furthermore, "two critical elements" must be met for a criminal or penal law to be deemed ex post facto: "it must be retrospective, that is, it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." *Weaver*, 450 U.S. at 29 (footnote omitted). As such, "[o]nly those laws which disadvantage a defendant **and** fall within a *Calder* category are ex post facto laws and constitutionally infirm." *Commonwealth v. Young*, 637 A.2d 1313, 1318 (Pa. 1993) (emphasis in original). The ex post facto clauses of the United States and Pennsylvania Constitutions are implicated here because a holding rendering the effects of SORNA's registration requirements punitive would place the statute into the third *Calder* category: application of the statute would inflict greater punishment on appellant than the law in effect at the time he committed his crimes.

**IV. History of Pennsylvania Sex Offender Laws, Applicable Case Law, and SORNA**

**A. History of Pennsylvania Sex Offender Laws Prior to SORNA**

In *Commonwealth v. Williams*, 832 A.2d 962 (Pa. 2003) (*Williams II*), this Court provided a history of Pennsylvania's sex offender registration laws up until the time of that decision:

> In 1995, the General Assembly amended the Sentencing Code by adding Subchapter H, entitled "Registration of Sexual Offenders," codified at 42 Pa.C.S. §§9791-9799, and generally referred to as "Megan's Law" (hereinafter, "Megan's Law I"). Among other things, Megan's Law I established a procedure for adjudicating certain offenders—namely, those that committed one of the predicate offenses listed in the statute—as "sexually violent predators." The mandated procedure included a post-conviction, pre-sentence assessment by the Board, followed by a hearing before the trial court. At the hearing, the offender was presumed to be a sexually violent predator and bore the burden of rebutting such presumption by clear and convincing evidence. If the individual was adjudicated a sexually violent predator, he was subjected to an enhanced maximum sentence of life imprisonment for the predicate offense, as well

as registration and community notification requirements that were more extensive than those applicable to an offender who was not adjudicated a sexually violent predator.

In *Commonwealth v. Williams*, … 733 A.2d 593 ([Pa.] 1999) (*Williams I*), this Court struck down the sexually violent predator provisions of Megan's Law I based upon the conclusion that a finding of sexually violent predator status under that enactment entailed a "separate factual determination, the end result of which is the imposition of criminal punishment," *i.e.*, increasing the offender's maximum term of confinement above the statutory maximum for the underlying offense. *See id.* … at 603. ... Notably, in view of the punitive nature of the increased maximum prison sentence, the *Williams I* Court invalidated the challenged provisions without reaching the question of whether the enhanced registration and notification requirements constituted criminal punishment. *See id.* … at 602 n.10.

After *Williams I* was decided, the General Assembly passed Megan's Law II, which was signed into law on May 10, 2000. Although the stated legislative policy remained the same as in Megan's Law I, the General Assembly altered the manner in which an individual convicted of a predicate offense was adjudicated a sexually violent predator. The critical distinction, for present purposes, is that, under Megan's Law II an offender convicted of an enumerated predicate offense is no longer presumed to be a sexually violent predator. ... Additionally, persons adjudicated to be sexually violent predators are no longer subjected to an automatic increased maximum term of imprisonment for the predicate offense. Instead, they are required to undergo lifetime registration, notification, and counseling procedures; failure to comply with such procedures is penalized by a term of probation or imprisonment.

Under Megan's Law II, any offender convicted of a predicate offense, whether or not he is deemed a sexually violent predator, must: (1) register his current residence or intended residence with the state police upon release from incarceration, parole from a correctional institution, or commencement of an intermediate punishment or probation; (2) inform the state police within ten days of a change in residence; and (3) register within ten days with a new law enforcement agency after establishing residence in another state. State police officials then forward this data, together with fingerprint and photographic information obtained from the sentencing court to the chief of police of the locality where the offender will reside following his change of address or release from prison. For sexually violent predators, the police chief in turn notifies the individual's neighbors, as well as day care operators and school officials within the municipality. The data sent to these recipients includes the offender's name, address, offense, and photograph (if available), as well as the fact

that he has been determined by a court to be a sexually violent predator, "which determination has or has not been terminated as of a date certain." The sexually violent predator's name and address, including any subsequent change of address, is also sent to the victim of the offense, until the victim requests that such notification be terminated.

* * *

In addition to registration upon release from prison and upon changes of address, sexually violent predators must periodically verify their address with the state police. To accomplish this, the state police send a verification form once every three months to the last residence reported. Upon receipt of this form, the sexually violent predator must appear within ten days at any state police station to submit the completed form and be photographed. The Act also requires a sexually violent predator to attend "at least monthly" counseling sessions in a program approved by the Board, and to pay all fees assessed from such sessions, unless he cannot afford them, in which case they are paid by the parole office. The Board monitors compliance with this requirement; the sexually violent predator must also verify such compliance with the state police as part of the quarterly verification process discussed above.

*Williams II*, 832 A.2d at 965-68 (internal citations and footnotes omitted).

The General Assembly made further amendments to Megan's Law II with the passage of Act 152 of 2004, commonly referred to as Megan's Law III, which was signed into law on November 24, 2004. *Commonwealth v. Neiman*, 84 A.3d 603, 607 (Pa. 2013). Although this Court struck down that statute on the basis its passage violated the single subject rule, we recognized Megan's Law III made the following substantive legal changes:

(1) established a two-year limitation for asbestos actions[8]; (2) amended the Crimes Code to create various criminal offenses for individuals subject to sexual offender registration requirements who fail to comply; (3) amended the provisions of the Sentencing Code which govern "Registration of Sexual Offenders"; (4) added the offenses of luring and institutional sexual assault to the list of enumerated offenses which require

---

[8] The inclusion of this subsection provided the basis for the *Neiman* Court's decision to strike down the statute as being in violation of the single subject rule. *Neiman*, 84 A.3d at 610-13.

a 10-year period of registration and established local police notification procedures for out-of state sexual offenders who move to Pennsylvania; (5) directed the creation of a searchable computerized database of all registered sexual offenders ("database"); (6) amended the duties of the Sexual Offenders Assessment Board ("SOAB"); (7) allowed a sentencing court to exempt a lifetime sex offender registrant, or a sexually violent predator registrant, from inclusion in the database after 20 years if certain conditions are met; (8) established mandatory registration and community notification procedures for sexually violent predators; (9) established community notification requirements for a "common interest community"— such as a condominium or cooperative—of the presence of a registered sexually violent predator; (10) conferred immunity on unit owners' associations of a common interest community for good faith distribution of information obtained from the database; (11) directed the Pennsylvania State Police to publish a list of approved registration sites to collect and transmit fingerprints and photographs of all sex offenders who register at those sites; and (12) mandated the Pennsylvania Attorney General to conduct annual performance audits of state or local agencies who participate in the administration of Megan's Law, and, also, required registered sex offenders to submit to fingerprinting and being photographed when registering at approved registration sites.

*Id*., 84 A.3d at 606-07 (footnotes omitted), *citing* 18 Pa.C.S. §4915; 42 Pa.C.S. §§ 5524.1, 9792, 9795.1(a)(1), 9795.4, 9795.5, 9796, 9798, 9798.1, 9799, 9799.1, 9799.8. Megan's Law III was replaced by SORNA.

## B. Case Law Regarding the Constitutionality of Sex Offender Laws

Before reaching the specific provisions of SORNA at issue here, we summarize the reasoning in two pivotal cases, the analysis of which will frame our discussion below: the United States Supreme Court's decision in *Smith*, and this Court's decision in *Williams II*.

### i. Smith v. Doe

In *Smith*, the United States Supreme Court determined the registration requirements of Alaska's Sex Offender Registration Act (the Act), which applied to the sex-offender plaintiffs despite the fact they were convicted, sentenced, and released

from prison before its passage, were not retroactive punishment prohibited by the federal ex post facto clause. *Smith*, 538 U.S. at 105-06.[9] The High Court summarized the Alaska statute as follows:

> The Alaska law, which is our concern in this case, contains two components: a registration requirement and a notification system. Both are retroactive. The Act requires any "sex offender or child kidnapper who is physically present in the state" to register, either with the Department of Corrections (if the individual is incarcerated) or with the local law enforcement authorities (if the individual is at liberty). Prompt registration is mandated. If still in prison, a covered sex offender must register within 30 days before release; otherwise he must do so within a working day of his conviction or of entering the State. The sex offender must provide his name, aliases, identifying features, address, place of employment, date of birth, conviction information, driver's license number, information about vehicles to which he has access, and postconviction treatment history. He must permit the authorities to photograph and fingerprint him.

> If the offender is convicted of a single, nonaggravated sex crime, he must provide annual verification of the submitted information for 15 years. If he was convicted of an aggravated sex offense or of two or more sex offenses, he must register for life and verify the information quarterly. The offender must notify his local police department if he moves. A sex offender who knowingly fails to comply with the Act is subject to criminal prosecution.

> The information is forwarded to the Alaska Department of Public Safety, which maintains a central registry of sex offenders. Some of the data, such as fingerprints, driver's license number, anticipated change of address, and whether the offender has had medical treatment afterwards are kept confidential. The following information is made available to the public: "the sex offender's or child kidnapper's name, aliases, address, photograph, physical description, description[,] license [and] identification numbers of motor vehicles, place of employment, date of birth, crime for which convicted, date of conviction, place and court of conviction, length and conditions of sentence, and a statement as to whether the offender or kidnapper is in compliance with [the update] requirements … or cannot be located." The Act does not specify the means by which the registry

---

[9] The Supreme Court of Alaska later found the retroactive application of the Act unconstitutional under the ex post facto clause of the Alaska state constitution. *See Doe v. State*, 189 P.3d 999 (Ak. 2008).

information must be made public. Alaska has chosen to make most of the nonconfidential information available on the Internet.

*Smith*, 538 U.S. at 90-91 (internal citations omitted). The High Court noted that, although it had not previously considered whether a sex offender statute constituted retroactive punishment forbidden by the federal ex post facto clause, the framework for the inquiry was well established. *Id.* at 92.

> We must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." *Kansas v. Hendricks*, 521 U.S. 346, 361 … (1997). If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is "'so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.'" *Ibid.*, *quoting United States v. Ward*, 448 U.S. 242, 248-49 … (1980). Because we "ordinarily defer to the legislature's stated intent," *Hendricks*, *supra*, at 361, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson v. United States*, 522 U.S. 93, 100 (1997), *quoting Ward*, *supra*, at 249.

*Smith*, 538 U.S. at 92.

In determining Alaska's legislature intended to establish a civil, nonpunitive scheme, the Court looked to the text of the statute where the legislature found "'sex offenders pose a high risk of re-offending,' and identified 'protecting the public from sex offenders' as the 'primary governmental interest' of the law." *Id.*, at 93, *citing* 1994 Alaska Sess. Laws ch. 41, §1. The Court also looked to *Hendricks* where it previously held "an imposition of restrictive measures on sex offenders adjudged to be dangerous is 'a legitimate nonpunitive governmental objective and has been historically so regarded.'" *Smith*, 538 U.S. at 93, *quoting Hendricks*, 521 U.S. at 363. The Court noted the location of the Act's notification provisions in the state's health, safety, and housing code suggested a civil scheme, while the location of the Act's registration provisions in the state's criminal procedure code suggested a penal intent; the Court stated neither factor was dispositive. *Smith*, 538 U.S. at 94. The Court concluded the

Act "does not require the procedures adopted to contain any safeguards associated with the criminal process," and led the Court to "infer that the legislature envisioned the Act's implementation to be civil and administrative." *Id*. at 96. The High Court determined the statute utilized "distinctly civil procedures" and the Alaska legislature therefore "intended a civil, not a criminal sanction." *Id*. (internal quotations and citations omitted).

The High Court then looked to the factors listed in *Mendoza-Martinez* as a framework for determining whether the provisions of the Alaska statute were so punitive in effect as to negate the legislature's intention to identify the scheme as civil. *Id*. at 97. The *Mendoza-Martinez* factors are as follows: "[w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned[.]" *Mendoza-Martinez*, 372 U.S. at 168-69 (footnotes omitted).

The High Court first determined the Alaska statute's notification provisions did not resemble shaming punishments of the colonial era, which involved more than the dissemination of information, and included either face-to-face shaming in view of other citizens or expulsion from the community. *Smith*, 538 U.S. at 97-98. The Court further found the Alaska statute involved only the dissemination of accurate information about an offender's criminal record, which is already public. *Id*. The Court noted the fact the information is available on the internet did not alter its conclusion, as the purpose of the internet posting was to inform the public rather than shame the offender, and the website did not allow the public to shame offenders by posting comments. *Id*. at 99.

The Court also determined the Act did not impose a physical restraint. *Id.* at 100. The Court found the Act did not make offenders unemployable; even in the absence of this statute, employers could conduct criminal record checks and exclude offenders from employment and those consequences flowed from the offender's conviction rather than the Act's registration and notification provisions. *Id.* at 100-01. The Court noted the argument Alaska's registration system was parallel to the restraint imposed on those on probation or supervised release "has some force," but ultimately rejected it, holding offenders are "free to move where they wish and to live and work as other citizens, with no supervision." *Id.* at 101. Furthermore, the Court noted although offenders were required to inform authorities of changes to their registration information, they did not need to seek permission to make such changes. *Id.*

Although the State of Alaska conceded its registration statute might deter future crimes, the *Smith* Court held this was not enough to find the law punitive because holding a deterrent purpose automatically renders such sanctions criminal "would severely undermine the Government's ability to engage in effective regulation." *Id.* at 102, *quoting Hudson*, 522 U.S. at 105. The Court further held the registration provisions were not retributive because the duration of the reporting requirement depended on the crime rather than the risk posed by the offender. *Id.* The Court concluded the broad registration categories and corresponding reporting requirements "are reasonably related to the danger of recidivism, and this is consistent with the regulatory objective." *Smith*, 538 U.S. at 102.

The Court then held "[t]he Act's rational connection to a nonpunitive purpose is a '[m]ost significant' factor in our determination that the statute's effects are not punitive." *Id.*, *quoting United States v. Ursery*, 518 U.S. 267, 290 (1996). The Court acknowledged both the lower court and Doe conceded the nonpunitive purpose of

public safety was valid and rational. *Id.* at 103. The Court further stated even though the Act may not have been narrowly drawn to accomplish that public safety purpose, a "statute is not deemed punitive simply because it lacks a close perfect fit with the nonpunitive aims it seeks to advance." *Id.*

The Court further held the Act was not excessive in its application to all offenders regardless of their future dangerousness as the registration requirements were minor and allowed the public to assess risk based on accurate, public information about offenders' convictions. *Id.* at 104. The Court also held the wide dissemination of the information over the internet was not excessive as the notification system was passive in that an individual must seek out the information, the website warned against using the information in a criminal manner, and making the registry available on the internet was necessary based on the general mobility of the population. *Id.* at 104-05.

The Court also stated two factors—whether the regulation comes into play only on a finding of scienter and whether the behavior to which it applies is already a crime— are of little weight as the Act applied only to past criminal conduct, which is a necessary starting point for targeting the statutory concern of recidivism. *Id.* at 105. The *Smith* Court then concluded the plaintiffs were unable to show the effects of the Alaska statute negated the legislature's intent to establish a civil scheme. The Court held "[t]he Act is nonpunitive, and its retroactive application does not violate the [federal] *Ex Post Facto Clause.*" *Id.* at 105-06.

### ii. Williams II

In *Williams II*, this Court considered whether the registration, notification, and counseling requirements of Megan's Law II, applicable to sexually violent predators, constituted criminal punishment such that their imposition on the defendants violated

their rights to due process under the United States and Pennsylvania Constitutions.[10] *Williams*, 832 A.2d at 964. This Court analyzed the statute's provisions under the same two-level inquiry used by the U.S. Supreme Court in *Smith*. *Id.* at 971. As to the first question, whether the General Assembly's intent was to punish, the *Williams II* Court determined the statute's statement of purpose was clear in that its intent was to identify potential recidivists and avoid recidivism by providing awareness of particular risks to members of the public and providing treatment to offenders. *Id.* at 971-72. The Court stated the statute's purpose was therefore "not to punish, but to promote public safety through a civil, regulatory scheme." *Id.* at 972.

The *Williams II* Court then examined the *Mendoza-Martinez* factors to determine whether the sanctions are "so punitive as to transform what was clearly intended as a civil remedy into a criminal penalty." *Id.*, *quoting Ward*, 448 U.S. at 249. The Court first found the registration requirements of Megan's Law II did not directly impose a deprivation or restraint upon sexually violent predators as they "remain free to live where they choose, come and go as they please, and seek whatever employment they may desire." *Id.* at 973, *quoting Femedeer v. Haun*, 227 F.3d 1244, 1250 (10th Cir. 2000). Thus, the Court held it could not find the clearest proof the requirements were "so onerous as to constitute an affirmative disability or restraint." *Williams*, 832 A.2d at 975. The Court further found it was not clear the notification requirements of Megan's Law II were analogous to public shaming, or other historical forms of punishment, as "the disclosure of factual information concerning the local presence of a potentially

---

[10] *Williams II* arose out of the Commonwealth's appeal from two orders of the Court of Common Pleas of Erie County, which struck down certain portions of Megan's Law II as violative of the due process clauses of the United States and Pennsylvania Constitutions; the ex post facto clauses were not at issue. However, the central question in *Williams II*, as in this appeal, was whether certain provisions of Megan's Law II constituted punishment. *Williams II*, 832 A.2d at 968-69.

harmful individual is aimed, not at stigmatizing that individual, but allowing potentially vulnerable members of the public to avoid being victimized." *Id.* at 976.

The Court then found applicability of Megan's Law II does not depend only upon a finding of scienter since some predicate offenses can be committed whether or not the defendant is aware his conduct is criminal, *e.g.*, the statute applies to the crime of sexual abuse of children, where the defendant may be convicted despite the good faith belief the child was over eighteen years of age. *Id.* at 977-78. The *Williams II* Court further found since there was a substantial period of incarceration attached to the predicate offenses of rape and involuntary deviate sexual intercourse,[11] the prospects of registration and notification would have little deterrent effect upon a sexually violent predator. *Id.* at 978. The Court also found the measures were not retributive as they do not "require [a sexually violent predator to] 'pay his debt to society,' through the impositions of fines, restitution, or confinement." *Id.*, *quoting Williams v. Illinois*, 399 U.S. 235, 261 (1970) (Harlan, J., concurring).

The *Williams II* Court found the crucial determination of sexually violent predator status under Megan's Law II was not based upon the particular criminal conduct or crime at issue, but instead upon a separate finding of mental abnormality or personality disorder. *Williams II*, 823 A.2d at 978. The Court recognized, however, that whether the behavior to which Megan's Law II applies is already a crime is of little significance in evaluating whether or not the statute is punitive because "application to past criminal conduct is 'a necessary beginning point [where] recidivism is the statutory concern.'" *Id.* at 979, *citing Smith*, 538 U.S. at 105.

---

[11] 18 Pa.C.S. §§3121, 3123.

Additionally the Court found the sixth *Mendoza-Martinez* factor, whether the act has a rational connection to a nonpunitive purpose, "is a '[m]ost significant' factor in our determination that the statute's effects are not punitive." *Id.* at 979, *quoting Smith*, 538 U.S. at 102. The Court noted there are "grave concerns over the high risk of recidivism among convicted sex offenders," *id.* at 979, *quoting Smith*, 538 U.S. at 103, and it was significant that most of the notification provisions in Megan's Law II pertained to neighbors of sexually violent predators, social service agencies, schools, and day care centers. *Id.* The Court found concerns about information being placed on the internet to be unwarranted because Megan's Law II information was available to the public only upon request. *Id.* at 980. The Court distinguished Megan's Law II from New Jersey's sex offender statute which specifically authorized online dissemination of offender information. *Id.*, citing NJ. STAT. ANN. §§2C:7-12-2C:7-14. The Court concluded the "dissemination of sexually violent predator information to individual members of the public, upon request, appear[ed] to be a reasonable means chosen by the Legislature to serve the legitimate government interest in providing persons who may be affected by the presence of a sexually violent predator with the information they need to protect themselves[.]" *Id.* at 981.

Finally, the Court determined Megan's Law II's registration, verification, and counseling requirements were not sufficiently onerous to be considered punishment based upon alleged excessiveness. *Id.* at 982. Although the Court conceded it was "troubling" that the requirements last for the entire lifetime of the sexually violent predator, and the legislature could avoid excessiveness claims by allowing a sexually violent predator to invoke judicial review to demonstrate he no longer poses a substantial risk, the Court recognized the record did not include any information concerning the successful treatment of sexually violent predators. *Id.* at 982-83.

Accordingly, the *Williams II* Court established the registration, notification, and counseling requirements imposed on sexually violent predators under Megan's Law II were not punitive; thus their imposition did not violate the offenders' due process rights. *Id.* at 984.[12]

## C. SORNA

The General Assembly enacted SORNA in response to the federal Adam Walsh Child Protection and Safety Act of 2006, Public Law 109-248, 42 U.S.C. §§16901-16991,[13] which mandates that states impose on sex offenders certain tier-based registration and notification requirements in order to avoid being subject to a penalty, *i.e.*, the loss of federal grant funding.[14]    *In re J.B.*, 107 A.3d 1, 3 (Pa. 2014). Accordingly, Pennsylvania's General Assembly sought to comply with this federal legislation by providing for "the expiration of prior registration requirements, commonly

---

[12] The *Williams II* Court also weighed whether Megan's Law II's penalties for non-compliance, which subjected sexually violent predators to a possible term of life imprisonment, constituted punishment.  *Williams II*, 832 A.2d at 985.  The Court found these penalties must be considered punitive and unconstitutional as the new offense proceeds "directly from the Act's enforcement provisions" and "such measures are manifestly in excess of what is needed to ensure compliance[.]"  *Id.* at 985-86.

[13] The federal regime is also referred to as the "Jacob Wetterling, Megan Nicole Kanka, and Pam Lychner Sex Offender Registration and Notification Program," 42 U.S.C. §16902, or more simply as "federal SORNA."  *See, e.g.*, *United States v. Roberson*, 752 F. 3d 517, 518 (1st Cir. 2014); *Commonwealth v. Nase*, 104 A.3d 528, 532 (Pa. Super. 2014).

[14] The federal statute provides: "For any fiscal year after the end of the period for implementation, a jurisdiction that fails, as determined by the Attorney General, to substantially implement this subchapter shall not receive 10 percent of the funds that would otherwise be allocated for that fiscal year to the jurisdiction under subpart 1 of part E of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (42 U.S.C. 3750 et seq.)."  42 U.S.C. §16925(a).

referred to as Megan's Law [III], 42 Pa.C.S. §§9791-9799.9, as of December 20, 2012, and for the effectiveness of SORNA on the same date." *Id.*

The purposes of SORNA, as stated by the General Assembly, are as follows:

(1) To bring the Commonwealth into substantial compliance with the Adam Walsh Child Protection and Safety Act of 2006 …

(2) To require individuals convicted or adjudicated delinquent of certain sexual offenses to register with the Pennsylvania State Police and to otherwise comply with this subchapter if those individuals reside within this Commonwealth, intend to reside within this Commonwealth, attend an educational institution inside this Commonwealth or are employed or conduct volunteer work within this Commonwealth.

(3) To require individuals convicted or adjudicated delinquent of certain sexual offenses who fail to maintain a residence and are therefore homeless but can still be found within the borders of this Commonwealth to register with the Pennsylvania State Police.

(4) To require individuals who are currently subject to the criminal justice system of this Commonwealth as inmates, supervised with respect to probation or parole or registrants under this subchapter to register with the Pennsylvania State Police and to otherwise comply with this subchapter. To the extent practicable and consistent with the requirements of the Adam Walsh Child Protection and Safety Act of 2006, this subchapter shall be construed to maintain existing procedures regarding registration of sexual offenders who are subject to the criminal justice system of this Commonwealth.

(5) To provide a mechanism for members of the general public to obtain information about certain sexual offenders from a public Internet website and to include on that Internet website a feature which will allow a member of the public to enter a zip code or geographic radius and determine whether a sexual offender resides within that zip code or radius.

(6) To provide a mechanism for law enforcement entities within this Commonwealth to obtain information about certain sexual offenders and to allow law enforcement entities outside this Commonwealth, including those within the Federal Government, to obtain current information about certain sexual offenders.

42 Pa.C.S. §9799.10. Furthermore, the General Assembly expressed the legislative findings and declaration of policy supporting SORNA as follows:

**(a) Legislative findings.—** The General Assembly finds as follows:

(1) In 1995 the General Assembly enacted the act of October 24, 1995 (1st Sp. Sess. P.L. 1079, No. 24), commonly referred to as Megan's Law. Through this enactment, the General Assembly intended to comply with legislation enacted by Congress requiring that states provide for the registration of sexual offenders. The Federal statute, the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act (Public Law 103-322, 42 U.S.C. 14071 *et seq.*), has been superseded by the Adam Walsh Child Protection and Safety Act of 2006 (Public Law 190-248, 120 Stat. 587).

(2) This Commonwealth's laws regarding registration of sexual offenders need to be strengthened. The Adam Walsh Child Protection and Safety Act of 2006 provides a mechanism for the Commonwealth to increase its regulation of sexual offenders in a manner which is nonpunitive but offers an increased measure of protection to the citizens of this Commonwealth.

(3) If the public is provided adequate notice and information about sexual offenders, the community can develop constructive plans to prepare for the presence of sexual offenders in the community. This allows communities to meet with law enforcement to prepare and obtain information about the rights and responsibilities of the community and to provide education and counseling to residents, particularly children.

(4) Sexual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest.

(5) Sexual offenders have a reduced expectation of privacy because of the public's interest in public safety and in the effective operation of government.

(6) Release of information about sexual offenders to public agencies and the general public will further the governmental interests of public safety and public scrutiny of the criminal and mental health systems so long as the information released is rationally related to the furtherance of those goals.

(7) Knowledge of whether a person is a sexual offender could be a significant factor in protecting oneself and one's family members, or those in care of a group or community organization, from recidivist acts by such offenders.

(8) The technology afforded by the Internet and other modern electronic communication methods makes this information readily accessible to parents, minors, and private entities, enabling them to undertake appropriate remedial precautions to prevent or avoid placing potential victims at risk.

**(b) Declaration of policy.—** The General Assembly declares as follows:

(1) It is the intention of the General Assembly to substantially comply with the Adam Walsh Child Protection and Safety Act of 2006 and to further protect the safety and general welfare of the citizens of this Commonwealth by providing for increased regulation of sexual offenders, specifically as that regulation relates to registration of sexual offenders and community notification about sexual offenders.

(2) It is the policy of the Commonwealth to require the exchange of relevant information about sexual offenders among public agencies and officials and to authorize the release of necessary and relevant information about sexual offenders to members of the general public as a means of assuring public protection and shall not be construed as punitive.

(3) It is the intention of the General Assembly to address the Pennsylvania Supreme Court's decision in *Commonwealth v. Neiman*, [84 A.3d 603] (Pa. 2013), by amending this subchapter in the act of March 14, 2014 (P.L. 41, No. 19).

42 Pa.C.S. §9799.11(a)-(b).

SORNA's registration provisions are applicable to, *inter alia*, the following individuals: (1) those convicted of a sexually violent offense,[15] on or after the effective date of SORNA, who are residents of Pennsylvania, employed in Pennsylvania, students in Pennsylvania or transients; (2) those who are inmates, on or after the

---

[15] A sexually violent offense is defined as "[a]n offense specified in section 9799.14 (relating to sexual offenses and tier system) as a Tier I, Tier II or Tier III sexual offense." 42 Pa.C.S. §9799.12.

effective date of SORNA, in state or county prisons as a result of a conviction for a sexually violent offense; (3) those who, on or after the effective date of SORNA, are inmates in a federal prison or are supervised by federal probation authorities as a result of a sexually violent offense and have a residence in Pennsylvania, are employed in Pennsylvania, are students in Pennsylvania or transients; and, pertinent to this appeal, (4) those who were required to register under previous versions of Megan's Law and had not yet fulfilled their registration period as of the effective date of SORNA. 42 Pa.C.S. §9799.13.

SORNA classifies offenders and their offenses into three tiers. 42 Pa.C.S. §9799.14. Those convicted of Tier I offenses are subject to registration for a period of fifteen years and are required to verify their registration information and be photographed, in person at an approved registration site, annually. 42 Pa.C.S. §9799.15(a)(1), (e)(1).[16] Those convicted of Tier II offenses are subject to registration

---

[16] The Tier I offenses enumerated in SORNA are as follows: 18 Pa.C.S. §2902(b) (relating to unlawful restraint); 18 Pa.C.S. §2903(b) (relating to false imprisonment); 18 Pa.C.S. §2904 (relating to interference with custody of children); 18 Pa.C.S. §2910 (relating to luring a child into a motor vehicle or structure); 18 Pa.C.S. §3124.2(a) (relating to institutional sexual assault); 18 Pa.C.S. §3126(a)(1) (relating to indecent assault); 18 Pa.C.S. §6301(a)(1)(ii) (relating to corruption of minors); 18 Pa.C.S. §6312(d) (relating to sexual abuse of children); 18 Pa.C.S. §7507.1 (relating to invasion of privacy); 18 U.S.C. §1801 (relating to video voyeurism); 18 U.S.C. §2252(a)(4) (relating to certain activities relating to material involving the sexual exploitation of minors); 18 U.S.C. §2252A (relating to certain activities relating to material constituting or containing child pornography); 18 U.S.C. §2252B (relating to misleading domain names on the internet); 18 U.S.C. §2252C (relating to misleading words or digital images on the internet); 18 U.S.C. §2422(a) (relating to coercion and enticement); 18 U.S.C. §2423(b) (relating to transportation of minors); 18 U.S.C. §2423(c) (relating to engaging in illicit sexual conduct in foreign places); 18 U.S.C. §2424 (relating to filing factual statement about alien individual); 18 U.S.C. §2425 (relating to use of interstate facilities to transmit information about a minor); a comparable military offense or similar offense under the laws of another jurisdiction or foreign country or under a former law of this Commonwealth; an attempt, conspiracy or solicitation to commit any of the above offenses; and a conviction for a sexual offense in another jurisdiction or foreign country (continued…)

for a period of twenty-five years and are required to verify their registration information and be photographed, in person at an approved registration site, semi-annually. 42 Pa.C.S. §9799.15(a)(2), (e)(2).[17]

Those convicted of Tier III offenses are subject to lifetime registration and are required to verify their registration information and be photographed, in person at an approved registration site, quarterly. 42 Pa.C.S. §9799.15(a)(3), (e)(3). The Tier III offenses enumerated in SORNA—including the crime of which appellant was convicted, indecent assault where the individual is less than thirteen years of age—are as follows:

(1) 18 Pa.C.S. §2901(a.1) (relating to kidnapping).

(2) 18 Pa.C.S. §3121 (relating to rape).

(3) 18 Pa.C.S. §3122.1(b) (relating to statutory sexual assault).

---

(…continued)
that is not set forth in this section, but nevertheless requires registration under a sexual offender statute in the jurisdiction or foreign country. 42 Pa.C.S. §9799.14(b).

[17] The Tier II offenses enumerated in SORNA are as follows: 18 Pa.C.S. §3011(b) (relating to trafficking in individuals); 18 Pa.C.S. §3122.1(a)(2) (relating to statutory sexual assault); 18 Pa.C.S. §3124.2(a.2) and (a.3) (relating to institutional sexual assault in schools or child care centers); 18 Pa.C.S. §3126(a)(2), (3), (4), (5), (6) or (8) (relating to indecent assault when victim is over 13 years of age); 18 Pa.C.S. §5902(b.1) (relating to prostitution and related offenses); 18 Pa.C.S. §5903(a)(3)(ii), (4)(ii), (5)(ii) or (6) (relating to obscene and other sexual materials and performances); 18 Pa.C.S. §6312(b) and (c); 18 Pa.C.S. §6318 (relating to unlawful contact with minor); 18 Pa.C.S. §6320 (relating to sexual exploitation of children); 18 U.S.C. §1591 (relating to sex trafficking of children by force, fraud or coercion); 18 U.S.C. §2243 (relating to sexual abuse of a minor or ward); 18 U.S.C. §2244 (relating to abusive sexual conduct) where the victim is 13 years of age or older but under 18 years of age; 18 U.S.C. §2251 (relating to sexual exploitation of children); 18 U.S.C. §2251A (relating to selling or buying children); 18 U.S.C. §2252(a)(1), (2) or (3); 18 U.S.C. §2260 (relating to production of sexually explicit depictions of a minor for importation into the United States); 18 U.S.C. §2421 (relating to transportation generally); 18 U.S.C. §2422(b); 18 U.S.C. §2423(a); a comparable military offense or similar offense under the laws of another jurisdiction or foreign country or under a former law of this Commonwealth; and an attempt, conspiracy or solicitation to commit any of the above offenses. 42 Pa.C.S. §9799.14(c).

(4) 18 Pa.C.S. §3123 (relating to involuntary deviate sexual intercourse).

(5) 18 Pa.C.S. §3124.1 (relating to sexual assault).

(6) 18 Pa.C.S. §3124.2(a.1) [relating to institutional sexual assault].

(7) 18 Pa.C.S. §3125 (relating to aggravated indecent assault).

(8) 18 Pa.C.S. §3126(a)(7) (relating to indecent assault [of victim under 13 years of age]).

(9) 18 Pa.C.S. §4302(b) (relating to incest).

(10) 18 U.S.C. §2241 (relating to aggravated sexual abuse).

(11) 18 U.S.C. §2242 (relating to sexual abuse).

(12) 18 U.S.C. §2244 [abusive sexual contact] where the victim is under 13 years of age.

(13) A comparable military offense or similar offense under the laws of another jurisdiction or foreign country or under a former law of this Commonwealth.

(14) An attempt, conspiracy or solicitation to commit an offense listed in paragraph (1), (2), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12) or (13).

(15) (Reserved).

(16) Two or more convictions of offenses listed as Tier I or Tier II sexual offenses.

42 Pa.C.S. §§9799.14(d).

SORNA also establishes a statewide registry of sexual offenders to be created and maintained by the state police. 42 Pa.C.S. §9799.16(a). The registry contains information provided by the sexual offender, including: names and aliases, designations used by the offender for purposes of routing or self-identification in internet communications, telephone numbers, social security number, addresses, temporary habitat if a transient, temporary lodging information, passport and documents establishing immigration status, employment information, occupational and professional

licensing information, student enrollment information, motor vehicle information, and date of birth. 42 Pa.C.S. §9799.16(b). The registry also contains information from the state police, including the following: physical description of the offender, including a general physical description, tattoos, scars and other identifying marks, text of the statute defining the offense for which the offender is registered, criminal history information, current photograph, fingerprints, palm prints and a DNA sample from the offender, and a photocopy of the offender's driver's license or identification card. 42 Pa.C.S. §9799.16(c).

Not only does SORNA establish a registry of sexual offenders, but it also directs the state police to make information available to the public through the internet. 42 Pa.C.S. §9799.28. The resulting website "[c]ontains a feature to permit a member of the public to obtain relevant information for an [offender] by a query of the internet website based on search criteria including searches for any given zip code or geographic radius set by the user." 42 Pa.C.S. §9799.28(a)(1)(i). The website also "[c]ontains a feature to allow a member of the public to receive electronic notification when [an offender] provides [updated] information [and also allows] a member of the public to receive electronic notification when [an offender] moves into or out of a geographic area chosen by the user." 42 Pa.C.S. §9799.28(a)(1)(ii). The Pennsylvania website must coordinate with the Dru Sjodin National Sex Offender Public Internet Website (https://www.nsopw.gov) and must be updated within three business days of receipt of required information. 42 Pa.C.S. §9799.28(a)(1)(iii), (iv).

In addition to the offender's duty to appear at an approved registration site annually, semi-annually, or quarterly, depending upon the tier of their offense, all offenders are also required to appear in person at an approved registration site within three business days of any changes to their registration information including a change

of name, residence, employment, student status, telephone number, ownership of a motor vehicle, temporary lodging, e-mail address, and information related to professional licensing. 42 Pa.C.S. §9799.15(g). Offenders must also appear in person at an approved registration site within twenty-one days in advance of traveling outside the United States and must provide dates of travel, destinations, and temporary lodging. 42 Pa.C.S. §9799.15(i). Furthermore, transients, *i.e.* homeless individuals, must appear in person monthly until a residence is established. 42 Pa.C.S. §9799.15(h)(1). Offenders who fail to register, verify their information at the appropriate time, or provide accurate information are subject to prosecution and incarceration under 18 Pa.C.S. §4915.1 (failure to comply with registration requirements). 42 Pa.C.S. §9799.21(a).

### V. Federal Ex Post Facto Claim

We lead with appellant's federal claim in part because we recognize the General Assembly enacted SORNA in response to federal legislation. We also recognize the United States Supreme Court's decision in *Smith*—which arose out of a federal ex post facto challenge—guides our analysis. The United States Constitution provides: "No State shall ... pass any … ex post facto Law. ..." U.S. CONST. art I §10. Our decision regarding violation of this clause depends on a determination of whether SORNA's retroactive application to appellant constitutes punishment. Accordingly, we apply the two-part analysis employed in *Smith* and *Williams II*. We first consider whether the General Assembly's "intent was to impose punishment, and, if not, whether the statutory scheme is nonetheless so punitive either in purpose or effect as to negate the legislature's non-punitive intent." *Williams II*, 832 A.2d at 971. If we find the General Assembly intended to enact a civil scheme, we then must determine whether the law is punitive in effect by considering the *Mendoza-Martinez* factors. *Id.* at 972. We recognize only the "clearest proof" may establish that a law is punitive in effect. *Lee,*

935 A.2d at 876-77.  Furthermore, in determining whether a statute is civil or punitive, we must examine the law's entire statutory scheme.  *Smith*, 538 U.S. at 92.

### A. Intent of General Assembly

Appellant contends although SORNA's stated purpose is to protect the public, the real intent of the General Assembly is to punish offenders.  Appellant's Brief at 9. Appellant buttresses this argument by claiming SORNA's statement of purpose implicates "sexual offenders" who are classified solely by their criminal record rather than the class of "sexually violent predators" to whom the former Megan's Law statutes applied, and which required an individualized determination of SVP status.  *Id*. at 11. Appellant also points out SORNA is entirely codified under the sentencing section of Pennsylvania's Crimes Code.  *Id*. at 12-13.  Finally, appellant argues, SORNA vests administrative authority, not with a public safety department, but with the Pennsylvania State Police, a traditional enforcer of criminal laws, and failure to comply with SORNA results in arrest.  *Id*. at 13-14.

The Commonwealth concedes SORNA is broader in application than previous Megan's Law statutes, but nevertheless insists the statutes do not differ in purpose, as SORNA explicitly provides the registration requirements shall not be construed as punitive.  Commonwealth's Brief at 15-16, *citing* 42 Pa.C.S. §9799.11(b)(2).  The Commonwealth further contends since the statutory language regarding purpose is unambiguous further interpretation of legislative intent should be avoided.  *Id*. at 16.

"In applying the first element of this test, the sole question is whether the General Assembly's intent was to punish."  *Williams II*, 823 A.2d at 971.  This is a question of statutory construction and "[w]e must consider the statute's text and its structure to determine the legislative objective."  *Smith*, 538 U.S. at 92, *citing Flemming v. Nestor*,

363 U.S. 603, 617 (1960). Furthermore, "considerable deference must be afforded to the intent as the legislature has stated it." *Id.* at 93. The General Assembly specifically stated SORNA "provides a mechanism for the Commonwealth to increase its regulation of sexual offenders in a manner which is nonpunitive but offers an increased measure of protection to the citizens of this Commonwealth." 42 Pa.C.S §9799.11(a)(2). The statute further states "the exchange of relevant information about sexual offenders ... [is] a means of assuring public protection and shall not be construed as punitive." 42 Pa.C.S. §9799.11(b)(2). Furthermore, the first listed purpose of SORNA is "[t]o bring the Commonwealth into substantial compliance with the [federal] Adam Walsh Child Protection and Safety Act of 2006." 42 Pa.C.S. §9799.10(1). Nothing in the expressed purpose, legislative findings, or declaration of policy of SORNA explicitly states the legislature intended the law to do anything other than create a remedial civil scheme to comply with federal legislation and protect the public.

At the same time, we recognize the following aspects of SORNA are troubling and actually cast doubt on the stated legislative intent: the act encompasses a much broader class of offenders than Megan's Law II, and includes relatively minor offenses within its net; the act is codified within the sentencing section of the Crimes Code; and the acts vests regulatory authority with the state police. However, we note the fact SORNA encompasses a broad class of offenders is a reflection of the legislature's intent to comply with federal sex offender laws for funding purposes. Furthermore, Megan's Law II was also codified completely within the Crimes Code and also vested regulatory authority in the state police. As such, we recognize the General Assembly's intent in enacting SORNA apparently was twofold: to comply with federal law; and, as we stated in *Williams II*, "not to punish, but to promote public safety through a civil, regulatory scheme." *Williams II*, 832 A.2d at 972.

## B. *Mendoza-Martinez* Factors

As we have determined the intent of the General Assembly was to enact a civil scheme, we now conduct an analysis of the *Mendoza-Martinez* factors to determine whether SORNA is sufficiently punitive in effect to overcome the General Assembly's stated nonpunitive purpose. *Williams II*, 832 A.2d at 971.

### i. Whether the Statute Involves an Affirmative Disability or Restraint

Appellant argues this factor weighs in favor of finding SORNA punitive as SORNA differs from the Alaska statute upheld in *Smith* by requiring quarterly in-person appearances and in-person appearances for any updates to an offender's information. Appellant contends even if he never changes his name, residence, employment, phone number, car, or e-mail address, or goes on vacation, he still must appear a minimum of 100 times over twenty-five years, and for the rest of his life. Appellant's Brief at 18, *citing* 42 Pa.C.S. §9799.15. PACDL contends not only does SORNA impose major, direct disabilities and restraints such as in-person reporting and updating requirements that were not present in the statutes analyzed in *Smith* or *Williams II*, but it also imposes extraordinary secondary disabilities in finding and keeping housing, employment, and schooling, traveling out of state, and increases the likelihood the offender may be subject to violence and adverse social and psychological impacts. PACDL's Brief at 43-45.

The Commonwealth responds by arguing although it is true the Alaska statute did not contain in-person reporting requirements, the *Smith* Court gave great weight to the fact Alaska's statute did "not restrain activities sex offenders may pursue but leaves them free to change jobs or residences." Commonwealth's Brief at 19, *quoting Smith*, 538 U.S. at 100. The Commonwealth further argues our Superior Court, in

*Commonwealth v. Woodruff*, 135 A.3d 1045 (Pa. Super. 2016), noted the *Williams II* Court found monthly counseling sessions, which seem more onerous than SORNA's quarterly in-person reporting requirements, did not impose an affirmative disability or restraint under Megan's Law II. Commonwealth's Brief at 20, *citing Woodruff*, 135 A.3d at 1052-53. Although the Commonwealth acknowledges the *Woodruff* panel ultimately found this factor weighed in favor of finding SORNA's scheme to be punitive, the Commonwealth nevertheless contends this Court, in light of its prior holding regarding monthly counseling sessions in *Williams II*, should find this factor to weigh in favor of determining SORNA is nonpunitive. Commonwealth's Brief at 22.

We are substantially aligned with appellant as to this factor. The *Smith* Court found the Alaska statute did not involve an affirmative disability or restraint partly due to the fact it does not require in-person updates. *Smith*, 538 U.S. at 102. We hold this distinction from SORNA is important. *See, e.g.*, *Perez*, 97 A.3d at 753-54 (noting Alaska statute did not require in-person updates and distinguishing SORNA where Perez, a Tier II SORNA offender, was affirmatively required to report fifty times over twenty-five-year period). As stated, appellant, who was retroactively required to register as a Tier III offender under SORNA, is now required to appear in person at a registration site four times a year, a minimum of 100 times over the next twenty-five years, extending for the remainder of his life. *See* 42 Pa.C.S §9799.15(e)(3). In fact, this is the minimum number of times appellant will have to appear in person, and does not account for the times he must appear due to his "free" choices including "moving to a new address or changing his appearance[.]"[18] *See* 42 Pa.C.S. §9799.15(g); *Perez*, 97

---

[18] We are cognizant that restrictions on housing also arise from different statutes, such as 42 U.S.C. §13663(a), which prohibits Tier III offenders, like appellant, from residing in federally subsidized housing.

A.3d at 754. Furthermore, a homeless offender, referred to in the statute as a "transient," is required to appear in person monthly, a minimum of 300 times over twenty-five years. *See* 42 Pa.C.S. §9799.15(h)(1). The Commonwealth's argument the *Williams II* Court found more onerous monthly counseling sessions for sexually violent predators were not an affirmative disability or restraint is unpersuasive. The *Williams II* Court based its decision partly on the fact the counseling sessions requirement was designed to "assist the sexually violent predator, who is likely to be impulsive, irresponsible and burdened with poor behavioral controls, from relapsing into sexually predatory behavior." *Williams II*, 832 A.2d at 975 (footnote omitted). Under SORNA, where there has been no finding that individuals subject to the in-person registration requirements are sexually violent predators, subject to needed counseling, the in-person appearances do not constitute counseling in any event. Thus, the reasoning on this point in *Williams II* simply does not apply. As such, we find the in-person reporting requirements, for both verification and changes to an offender's registration, to be a direct restraint upon appellant and hold this factor weighs in favor of finding SORNA's effect to be punitive.

### ii. Whether the Sanction Has Been Historically Regarded as Punishment

Appellant also contends the requirements of SORNA closely parallel historical forms of punishment such as probation and parole since the in-person reporting requirements are similar to meeting with a probation officer, and sex offenders also have a reduced expectation of privacy under the statute. Appellant's Brief at 19-20, *citing* 42 Pa.C.S. §9799.11(a)(5). Appellant notes this is a distinct difference from the Alaska statute at issue in *Smith* where the High Court rejected such an argument on the basis the Alaska statute contained no mandatory conditions comparable to probation.

Appellant's Brief at 19, *citing Smith*, 538 U.S. at 101. PACDL posits the stated purpose of both probation and SORNA is to promote public safety, both rest on the assumption the individual requires supervision, both are imposed by the trial court at the time of sentencing and are part of the Sentencing Code, both require regular, in-person appearances, and both probationers and registrants must comply or face sanctions. PACDL's Brief at 46-47.[19] PACDL also contends SORNA is similar to shaming punishments and has been recognized as such by other jurisdictions. PACDL argues historical shaming punishments involved the public disclosure of similar information about offenders and SORNA's declaration that all registrants are "sex offenders" and "high risk" is akin to a scarlet letter which the offender has no mechanism to dispute. *Id.* at 47-48.

The Commonwealth contends although SORNA registration may be like some probationary terms, probation takes many forms and can be much more burdensome than SORNA's requirements. Commonwealth's Brief at 24. The Commonwealth also argues should the Court find this factor weighs in favor of finding SORNA punitive, the factor should be given little weight as probation is the least onerous and newest form of traditional punishment. *Id.* at 23-25, *citing Woodruff*, 135 A.3d at 1055. The Commonwealth also contends registration is not similar to shaming as the public display is not for the purpose of ridicule, but instead to inform the public for its own safety. Commonwealth's Brief at 25-26, *citing Kammerer v. State*, 322 P.3d 827, 835-36 (Wyo. 2014).

---

[19] PACDL also notes other jurisdictions have held sex offender registration laws are similar to probation. PACDL's Brief at 46, *citing Doe v. Dep't of Pub. Safety & Corr. Serv.*, 62 A.3d 123 (Md. 2013); *Wallace v. State*, 905 N.E.2d 371 (Ind. 2009); *Doe*, 189 P.3d 999.

The United States Supreme Court has distinguished colonial-era public shaming punishments from sex offender registration laws by noting public shaming "involved more than the dissemination of information" but also "held the person up before his fellow citizens for face-to-face shaming or expelled him from the community." *Smith*, 538 U.S. at 98. The *Smith* Court found the sex offender information disseminated through the Alaska statute is accurate and, for the most part, already public. *Id.* The Court noted the publicity may cause embarrassment or ostracism for the convicted, but found "the publicity and resulting stigma [is not] an integral part of the objective of the regulatory scheme." *Id.* at 99. The Court also stated the fact the information is posted on the internet did not alter its conclusion since the intent of the posting is to inform the public for its own safety, the website itself does not provide the public with a means to shame the offender, and members of the public must affirmatively seek out the information. *Id.*

As stated above, we recognize the significance of the *Smith* Court's decision with regard to its analysis of the Alaska statute. However, *Smith* was decided in an earlier technological environment. The concurring expression by now-Justice Donohue in *Perez* has particular force on this point:

> The environment has changed significantly with the advancements in technology since the Supreme Court's 2003 decision in *Smith*. As of the most recent report by the United States Census Bureau, approximately 75 percent of households in the United States have internet access. Yesterday's face-to-face shaming punishment can now be accomplished online, and an individual's presence in cyberspace is omnipresent. The public internet website utilized by the Pennsylvania State Police broadcasts worldwide, for an extended period of time, the personal identification information of individuals who have served their "sentences." This exposes registrants to ostracism and harassment without any mechanism to prove rehabilitation—even through the clearest proof. In my opinion, the extended registration period and the worldwide dissemination of registrants' information authorized by SORNA now outweighs the public safety interest of the government so as to disallow a finding that it is merely regulatory.

*Perez*, 97 A.3d at 765-66 (Donohue, J., concurring).

Furthermore, although the *Smith* Court ultimately rejected the argument Alaska's registration system was like probation because it did not impose mandatory conditions, the High Court nevertheless recognized the argument has "some force" and the argument is therefore even more compelling where SORNA does impose such conditions. *See Id.* at 763 (Donohue, J. concurring), *citing Smith*, 538 U.S. at 101. It is clear the Alaska statute at issue in *Smith* and SORNA are materially different in this regard. As our analysis of the similarity to probation would be nearly identical to Justice Donohue's analysis of the issue in *Perez*, we again quote from her concurring opinion with minimal, bracketed, differences arising out of appellant's status as a Tier III offender:

> In contrast, the mandatory in-person verification requirement in Section 9799.15(e) not only creates an affirmative restraint upon [appellant], requiring him to appear at a designated facility a minimum of [100] times over the next 25 years[, extending for the remainder of his life,] as a Tier [III] offender, but also greatly resembles the periodic meetings with probation officers imposed on probationers. … [B]ecause SORNA differs significantly from the statute at issue in *Smith*, these disparities must be considered.

> In [*Williams II*,] the Pennsylvania Supreme Court found that probation has historically been considered a traditional form of punishment. *Williams [II]*, 832 A.2d at 977. Probation entails a set of mandatory conditions imposed on an individual who has either been released after serving a prison sentence, or has been sentenced to probation in lieu of prison time. 42 Pa.C.S. §9754. These conditions can include psychiatric treatment, limitations on travel, and notifying a probation officer when any change of employment or residency occurs. 42 Pa.C.S. §9754(c). Probationers are also subject to incarceration for a violation of any condition of their probation. 42 Pa.C.S. §9771.

> Like the conditions imposed on probationers, registrants under SORNA must notify the state police of a change in residence or employment. 42 Pa.C.S. §9799.15(g). Offenders also face incarceration for any non-compliance with the registration requirements. 42 Pa.C.S. §9799.22(a). Furthermore, SORNA requires registrants who do not have a fixed place of work to provide "general travel routes and general areas where the individual works" in order to be in compliance. 42 Pa.C.S. §9799.16. The

Supreme Court in *Smith* stated that "[a] sex offender who fails to comply with the reporting requirement may be subjected to criminal prosecution for that failure, but any prosecution is a proceeding separate from the individual's original offense." *Smith*, 538 U.S. at 101-02. However, violations for noncompliance with both probation and SORNA registration requirements are procedurally parallel. Both require further factual findings to determine whether a violation has actually occurred. 42 Pa.C.S. §§9771(d), 9799.21. Similarly, but for the original underlying offense, neither would be subject to the mandatory conditions from which the potential violation stems. The parallels between the SORNA registration requirements and probation lead me to conclude that factor two of the [*Mendoza-Martinez*] test leans towards a finding that SORNA is punitive.

*See Perez*, 97 A.3d at 763-64 (Donohue, J. concurring).

We conclude the weighing process with regard to this *Mendoza-Martinez* factor presents a much closer case than the *Smith* Court's analysis of Alaska's registration statute in 2003. We consider SORNA's publication provisions—when viewed in the context of our current internet-based world—to be comparable to shaming punishments. We also find SORNA and the Alaska statute are materially different in their mandatory conditions such that SORNA is more akin to probation. We therefore hold this factor weighs in favor of finding SORNA's effect to be punitive.

### iii. Whether the Statute Comes into Play Only on a Finding of Scienter

Appellant presents no argument on this factor, noting the *Smith* Court did not analyze it because it carried little weight in determining the punitive nature of the Alaska statute. Appellant's Brief at 20, *citing Smith*, 538 U.S. at 105. The Commonwealth agrees with appellant. On the other hand, PACDL argues the question of scienter does weigh in favor of finding SORNA is punitive because registration flows directly from a finding of guilt, which requires a particular mental state. PACDL's Brief at 49, *citing Smith*, 538 U.S. at 105. We recognize that where the concern of a sex offender registration statute like SORNA is protecting the public against recidivism, past criminal

conduct is "a necessary beginning point." *Smith*, 538 U.S. at 105. As such, we agree with the *Smith* Court in finding this factor is of little significance in our inquiry. *See id.*

### iv. Whether the Operation of the Statute Promotes the Traditional Aims of Punishment

Appellant next argues SORNA operates to promote the traditional aims of punishment—retribution and deterrence. Appellant's Brief at 20. Appellant argues SORNA promotes deterrence much like incarceration and probation do; the prospect of being labeled a sex offender accompanied by registration requirements and the public dissemination of personal information on the internet will deter the commission of sex offenses. *Id.* Appellant further argues SORNA has retributive aspects since it applies only after an individual commits a crime, and the additional punishment for failure to register or provide accurate information, *see* 18 Pa.C.S. §4915.1, is also related to retribution. Appellant's Brief at 21. Appellant contends distribution of private information online also exacts retribution. *Id.* at 21-23. To this point, appellant recognizes the *Smith* Court stated the dissemination of accurate information may properly flow from an offender's conviction, which is a matter of public record. *Id.* at 22. However, appellant notes the information disseminated under SORNA goes beyond conviction data and includes sufficient information to allow members of the public to harass an offender, and thus endanger public safety. *Id.* at 22-23.

PACDL posits SORNA is designed to have deterrent and retributive effects. PACDL notes deterrence is an obvious goal of sex offender registration laws. PACDL's Brief at 50, *citing Commonwealth v. Gehris*, 54 A.3d 862, 878 (Pa. 2012) (Castille, C.J., opinion in support of reversal). PACDL also contends the analysis here is different from that in *Williams II* as SORNA is different from Megan's Law II in significant ways; many SORNA offenses are misdemeanors where lengthy incarceration is unlikely and often

impossible, and thus SORNA is the greatest form of deterrence for those crimes. PACDL's Brief at 50-51. As to retribution, PACDL posits registration is imposed automatically upon a conviction regardless of the underlying circumstances or the actual risk an offender may offend again. PACDL's Brief at 49-50. Thus, PACDL argues, SORNA exacts retribution for past crimes without regard to public safety interests. *Id.* at 50.

The Commonwealth acknowledges SORNA has a deterrent purpose and effect. Commonwealth's Brief at 28-29. However, the Commonwealth argues finding SORNA punitive (and thus incapable of retroactive application) would undermine the state's ability to regulate offenders and the risk of recidivism is too great a price to pay. *Id.* at 29, *citing Smith*, 538 U.S. at 102. The Commonwealth cites several studies which state sex offender recidivism rates are difficult to measure and are likely underreported, and as such, recidivism remains a valid legislative concern. Commonwealth's Brief at 29-30. The Commonwealth further contends results of studies may vary because the area is vast and complex; thus courts and legislatures have consistently relied on information demonstrating recidivism is a significant concern for adult offenders. *Id.* at 31, *citing United States v. Irey*, 612 F.3d 1160, 1214-15 (11th Cir. 2010) (citing cases raising concerns over sex offender recidivism). The Commonwealth contends, because of contrasting studies and real recidivism concerns, this Court should be wary of PACDL's contrary conclusions. Commonwealth's Brief at 33.

We are substantially aligned with appellant as to this factor, especially in light of the Commonwealth's concession that SORNA is meant to have a deterrent effect. We agree that the prospect of being labeled a sex offender accompanied by registration requirements and the public dissemination of an offender's personal information over the internet has a deterrent effect. We are also cognizant that "the mere presence of a

deterrent purpose" does not "render such sanctions 'criminal'." *Smith*, 538 U.S. at 102. On careful consideration, however, we cannot say there is only a **"mere presence"** of a deterrent effect embodied in SORNA. *See id.* (emphasis added). Contrary to Megan's Law II, as analyzed in *Williams II*, there is not a "substantial period of incarceration attached to" many of the predicate offenses requiring registration under SORNA, many of which are misdemeanors or carry relatively short maximum terms of incarceration.[20] *Williams II*, 832 A.2d at 978. This includes interference with custody of children, 18 Pa.C.S. §2904, a misdemeanor of the second degree which does not have a sexual component, and yet is a Tier I offense under SORNA. *See* 42 Pa.C.S. §9799.14(b)(3). A conviction under this subsection may not lead to incarceration, but would nevertheless require registration as a sex offender for a fifteen year period. In such a case, and for many other predicate offenses listed in the tier system, SORNA clearly aims at deterrence.[21]

Although we recognize both the High Court in *Smith* and this Court in *Williams II* found sex offender laws generally do not have a retributive purpose, we note there was

---

[20] SORNA predicate offenses that may be graded as misdemeanors under Pennsylvania law are as follows: interference with custody of children, 18 Pa.C.S. §2904; luring a child into a motor vehicle or structure, 18 Pa.C.S. §2910; indecent assault, 18 Pa.C.S. §3126(a)(1)-(6), (8); invasion of privacy, 18 Pa.C.S. §7507.1(b); and obscene and other sexual materials and performances, 18 Pa.C.S. §5903(a)(3)(ii), (4)(ii), (5)(ii), (6). SORNA predicate offenses that may have a maximum incarceration term of two years or less under federal law are as follows: video voyeurism, 18 U.S.C. §1801; misleading domain names on the internet, 18 U.S.C. §2252B; and abusive sexual conduct, 18 U.S.C. §2244.

[21] We recognize interference with custody of children is not an example on all fours with the present situation, as appellant is a Tier III offender and, in any event, many of the other minor offenses listed in the tier system do include sexual components. However, the *Smith* Court made clear we must examine the law's entire statutory scheme when determining whether a statute is truly civil or creates instead a punitive effect. *Smith*, 538 U.S. at 92. Thus, each and every predicate offense is relevant to our analysis.

minimal analysis on this point in either decision. Retribution, in its simplest terms, "affix[es] culpability for prior criminal conduct," *Hendricks*, 521 U.S. at 362, and in fact, SORNA is applicable only upon a conviction for a predicate offense. We recognize the *Smith* Court stated the dissemination of accurate, public record information, even over the internet, did not alter its conclusion that the Alaska statute did not have a punitive effect. However, the information SORNA allows to be released over the internet goes beyond otherwise publicly accessible conviction data and includes: name, year of birth, residence address, school address, work address, photograph, physical description, vehicle license plate number and description of vehicles. *See* 42 Pa.C.S. §9799.28(b)(1)-(8). Moreover, although the *Williams II* Court determined the dissemination of registration information provided by sexually violent predators under Megan's Law II was necessary to protect the public, the Court expressly stated the public notification and electronic dissemination provisions of that statute "need not be read to authorize public display of the information, as on the Internet." *Williams II*, 832 A.2d at 980. SORNA has increased the length of registration, contains mandatory in-person reporting requirements, and allows for more private information to be displayed online. *Perez*, 97 A.3d at 765 (Donohue, J. concurring). Under the circumstances, we conclude SORNA is much more retributive than Megan's Law II and the Alaska statute at issue in *Smith*, and this increase in retributive effect, along with the fact SORNA's provisions act as deterrents for a number of predicate offenses, all weigh in favor of finding SORNA punitive.

### v. Whether the Behavior to which the Statute applies is Already a Crime

Appellant concedes this factor does not carry much weight, but suggests it does weigh in favor of finding the statute punitive. Appellant's Brief at 23, *citing Smith*, 538

U.S. at 105. PACDL notes SORNA applies only after an individual has been convicted of a predicate crime and the registration requirements cannot be waived if the offender poses little or no risk; PACDL concludes this means the factor weighs in favor of finding SORNA is punitive. PACDL's Brief at 51. The Commonwealth responds by contending *Smith* should control here and this factor is of little weight. Commonwealth's Brief at 35, *citing Smith*, 538 U.S. at 105. As with the third *Mendoza-Martinez* factor discussed above, this factor carries little weight in the balance. We again recognize where SORNA is aimed at protecting the public against recidivism, past criminal conduct is "a necessary beginning point." *See Smith*, 538 U.S. at 105.

### vi. Whether there is an Alternative Purpose to which the Statute may be Rationally Connected

Appellant concedes this factor weighs in favor of finding SORNA to be nonpunitive as there is a rational connection to public safety and health. Appellant's Brief at 24. PACDL, however, submits SORNA is not rationally related to a nonpunitive purpose. PACDL contends most offenders will not commit another sexual offense, and SORNA therefore produces an illusion of security from stranger perpetrators when the majority of sexual crimes are committed by someone known to the victim. PACDL further argues SORNA diverts law enforcement efforts away from the most serious offenders and from effective methods of crime control and treatment. PACDL's Brief at 51-53.

The Commonwealth reiterates its recidivism-based arguments to conclude SORNA is rationally connected to the goals of public safety and health. Commonwealth's Brief at 35-37. *Amicus* PDAA posits appellant is misguided in asking this Court to second-guess legislative judgment since there is no absolute truth when it comes to the risk posed by sexual offenders. PDAA's Brief at 11-12. PDAA cites

studies that have found nearly forty percent of sexual offenders released from prison return to prison within three years for sexual offenses. *Id.* at 12. PDAA also contends any attempt to measure recidivism greatly understates the problem as the wide majority of sexual offenses are never reported. *Id.* at 13-15. PDAA concludes although there is no perfect solution to this problem, as with most policy problems, the General Assembly should be afforded deference in its judgment regarding a complex issue of social policy. *Id.* at 16-17.

We recognize there are studies which find the majority of sexual offenders will not re-offend, and that sex offender registration laws are ineffective in preventing re-offense; we also recognize there are studies that reach contrary conclusions. In this context, we find persuasive PDAA's argument that policy regarding such complex societal issues, especially when there are studies with contrary conclusions, is ordinarily a matter for the General Assembly. *See e.g.*, *Commonwealth v. Hale*, 128 A.3d 781, 785 (Pa. 2015) (where "substantial policy considerations" are involved "such matters are generally reserved … to the General Assembly"). The General Assembly made legislative findings that "[s]exual offenders pose a high risk of committing additional sexual offenses and protection of the public from this type of offender is a paramount governmental interest." 42 Pa.C.S. §9799.11(a)(4). Although there are contrary scientific studies, we note there is by no means a consensus, and as such, we defer to the General Assembly's findings on this issue. We are also cognizant that the General Assembly legislated in response to a federal mandate based on the expressed purpose of protection from sex offenders. *See* 42 U.S.C. §16901 ("In order to protect the public from sex offenders and offenders against children, and in response to the vicious attacks by violent predators against the victims listed below, Congress in this chapter establishes a comprehensive national system for the registration of those offenders

….").  We therefore conclude there is a purpose other than punishment to which the statute may be rationally connected and this factor weighs in favor of finding SORNA to be nonpunitive.

### vii. Whether the Statute is Excessive in Relation to the Alternative Purpose Assigned

Appellant notes the *Williams II* Court considered the fact there was no means under Megan's Law II for a judicially-determined sexually violent predator to demonstrate he no longer posed a substantial risk to the community—and thus escape lifetime registration—to be "troubling."  Appellant's Brief at 25, *quoting Williams II*, 832 A.2d at 982-83.  However, the *Williams II* Court ultimately found the record in that case did not include any information concerning the successful treatment of sexually violent predators to support a finding this effectively permanent requirement was excessive, given the presumption Megan's Law II was constitutional.  *Williams*, 832 A.2d at 983.  Appellant distinguishes SORNA because it does not require any judicial determination that offenders are sexually violent predators before applying its most severe requirements, and instead subjects all offenders within Tier III to the same reporting requirements as a sexually violent predator under Megan's Law II.  Appellant's Brief at 25-26, *citing Williams II*, 832 A.2d at 983.   Appellant contends SORNA's terms are excessive in this regard and he will never be able to overcome the presumption there is a high risk he will commit another sexual offense.  Appellant's Brief at 25-26.

PACDL also contends SORNA is excessive and significantly over-inclusive as it casts a global net which sweeps into the sex offender registry many minor and non-sexual offenses.  PACDL's Brief at 53.  PACDL asserts SORNA is ineffective in determining risk as it does not even require a risk assessment; PACDL notes this Court has found imprecision even in risk assessments.  *Id.* at 54, *citing Lee*, 935 A.2d at 885.

The Commonwealth responds by contending appellant's excessiveness argument lacks merit as his registration requirements are not as severe as those of a sexually violent predator under SORNA, who must attend monthly counseling sessions and be monitored by the State Sexual Offenders Assessment Board. Commonwealth's Brief at 37-38, *citing Woodruff*, 135 A.3d at 1061. The Commonwealth further notes sexually violent predators are subject to additional public notification procedures and publication on the internet of even more private information, including where they eat, spend time, and engage in leisure activities. Commonwealth's Brief at 38, *citing* 42 Pa.C.S. §§9799.27, 9799.28. The Commonwealth further notes the *Williams II* Court was concerned with excessiveness in the process by which courts determine whether or not an offender is a sexually violent predator rather than the excessiveness of the reporting conditions *per se.* Commonwealth's Brief at 39, *citing Williams II*, 832 A.2d at 982.

Once again, we are aligned with the arguments of appellant and PACDL. The *Williams II* Court observed with regard to Megan's Law II, "if the Act's imprecision is likely to result in individuals being deemed sexually violent predators who in fact do not pose the type of risk to the community that the General Assembly sought to guard against, then the Act's provisions could be demonstrated to be excessive ...." *Williams II*, 832 A.2d at 983. Furthermore, "'society has a significant interest in assuring that the classification scheme [of a sex offender registration law] is not over-inclusive.'" *Lee*, 935 A.2d at 883, *quoting Commonwealth v. Maldonado*, 838 A.2d 710, 715 (Pa. 2003). We apply this reasoning here, and we do not analyze excessiveness as applied only to appellant or sexually violent predators, but instead we examine SORNA's entire statutory scheme. *Smith*, 538 U.S. at 92. Moreover, we have already recognized SORNA categorizes a broad range of individuals as sex offenders subject to its

provisions, including those convicted of offenses that do not specifically relate to a sexual act. *See, e.g.,* 42 Pa.C.S. §9799.14(b)(1)-(3), (19) (pertaining to: unlawful restraint, 18 Pa.C.S. §2902(b); false imprisonment, 18 Pa.C.S. §2903(b); interference with custody of a child, 18 Pa.C.S. §2904; filing factual statement about alien individual, 18 U.S.C. §2424). Accordingly, we conclude SORNA's requirements are excessive and over-inclusive in relation to the statute's alternative assigned purpose of protecting the public from sexual offenders.

### viii. Balancing of Factors

Our review of SORNA under the *Mendoza-Martinez* factors reveals significant differences between Pennsylvania's most recent attempt at a sex offender registration statute and the statutes upheld in *Williams II* and *Smith*. As stated, we have determined four of the five factors to which we have given weight—all except for whether there is an alternative purpose to which the statute may be rationally connected—weigh in favor of finding SORNA to be punitive in effect despite its expressed civil remedial purpose. We conclude SORNA involves affirmative disabilities or restraints, its sanctions have been historically regarded as punishment, its operation promotes the traditional aims of punishment, including deterrence and retribution, and its registration requirements are excessive in relation to its stated nonpunitive purpose. Accordingly, we hold the retroactive application of SORNA to appellant violates the ex post facto clause of the United States Constitution.

## VI. State Ex Post Facto Claim

Having found retroactive application of SORNA violates the federal ex post facto clause, we might end our analysis here. *See, e.g.*, *Rose*, 127 A.3d at 798 n.11 (standards applied to determine ex post facto violations under state and federal clauses are comparable; law that violates federal ex post facto clause will be held to violate state clause such that Court "need not separately consider" it); *Commonwealth v. Gaffney*, 733 A.2d 616, 621 (Pa. 1999) (language of federal and state ex post facto clauses "virtually identical," same concerns shaped them, and "virtually identical standards have applied to determining whether" ex post facto violation has occurred under the two provisions). However, appellant presented a state constitutional challenge, of which we expressly granted review, and the parties and *amici* forwarded developed arguments on this claim. *But see Perez,* 97 A.3d at 766 (state ex post facto claim waived). Moreover, we are cognizant of the difficulties arising in the wake of a decision from this Court based exclusively on federal grounds, which is subsequently appealed to the United States Supreme Court and remanded after a contrary decision regarding the federal constitution; inevitably, a state claim follows and a decision rendered by this Court only after intervening uncertainty and delay. *Compare Pap's A.M. t/d/b/a Kandyland v. City of Erie*, 719 A.2d 273 (Pa. 1998) (striking down nude dancing ordinance on basis of federal First Amendment protections; state constitutional claim not reached), *reversed by City of Erie v. Pap's A.M. t/d/b/a Kandyland*, 529 U.S. 277 (2000) (upholding nude dancing ordinance as content-neutral and not violative of federal free speech protections) *with Pap's A.M. t/d/b/a Kandyland v. City of Erie*, 812 A.2d 591 (Pa. 2002) (nude dancing ordinance violates Pennsylvania Constitution free speech provision). *See also Doe*, 189 P.3d 999 (upon remand from United States

Supreme Court, retroactive application of Alaska's sex offender registration law held unconstitutional under state ex post facto clause).

We are also aware our decision that SORNA violates the federal ex post facto clause is a departure from federal case law which has upheld the Adam Walsh Act against federal ex post facto challenges. *See, e.g., United States v. Young*, 585 F.3d 199, 203-06 (5th Circ. 2009) (retroactive application of federal SORNA does not violate federal ex post facto clause); *United States v. May*, 535 F.3d 912, 919-20 (8th Circ. 2008) (same), *cert denied*, *May v. United States*, 556 U.S. 1258 (2009), *abrogated on other grounds by Reynolds v. United States*, 565 U.S. 432 (2012). Under the circumstances, we consider it salutary to decide appellant's state constitutional challenge, and our approach is not unprecedented. *See Commonwealth v. Kohl*, 615 A.2d 308, 315 (Pa. 1992) ("While we have held that the searches authorized by §1547(a)(2) violate the Federal Constitution, the constitutionality of the searches under Article I, section 8 must be addressed also. We conclude that the searches are impermissible under the Pennsylvania Constitution. The analysis underlying our holding is separate and independent from the analysis undertaken under the Federal Constitution. Therefore, our holding under the Pennsylvania Constitution would remain unchanged should the U.S. Supreme Court resolve the issue contrary to our analysis of the federal constitutional question."). Accordingly, we proceed to determine whether the Pennsylvania Constitution provides even greater ex post facto protections than its federal counterpart by analyzing the following four factors: 1) text of the Pennsylvania constitutional provision; 2) history of the provision, including Pennsylvania case law; 3) related case law from other states; and 4) policy considerations, including unique issues

of state and local concern, and applicability within modern Pennsylvania jurisprudence. *Edmunds*, 586 A.2d at 894-95 (Pa. 1991).[22]

---

[22] We note the Adam Walsh Act—pursuant to which SORNA was enacted — anticipates the possibility that state compliance with the federal mandate might violate a state's constitution, and provides for the possibility that a penalty for noncompliance might not apply in such situations. *See* 42 U.S.C. §16925(b)(1) ("When evaluating whether a jurisdiction has substantially implemented this subchapter, the Attorney General shall consider whether the jurisdiction is unable to substantially implement this subchapter because of a demonstrated inability to implement certain provisions that would place the jurisdiction in violation of its constitution, as determined by a ruling of the jurisdiction's highest court."). Our analysis on state grounds averts the "consultation" procedure intended to determine whether compliance with the federal legislation might violate a state's own constitution: "In considering whether compliance with the requirements of this subchapter would likely violate the jurisdiction's constitution or an interpretation thereof by the jurisdiction's highest court, the Attorney General shall consult with the chief executive and chief legal officer of the jurisdiction concerning the jurisdiction's interpretation of the jurisdiction's constitution and rulings thereon by the jurisdiction's highest court." *See* 42 U.S.C. §16925(b)(2). In the event the state's constitution is violated by compliance, the federal statute allows for "reasonable alternative procedures or accommodations" such that the state might avoid reduced federal funding. 42 U.S.C. at §16925(b)(3). Parenthetically, we recognize the federal statute does not expressly require retroactivity but instead authorizes the Attorney General to specify such applicability. *See* 42 U.S.C. §16913(d) ("The Attorney General shall have the authority to specify the applicability of the requirements of this subchapter to sex offenders convicted before the enactment of this chapter[.]"). We further note the Attorney General has promulgated national guidelines which require states to include retroactive application as part of the federal SORNA requirements; thus the noncompliance provisions are implicated here. *See* 73 FR 38030-01 at 38046-47 (July 2, 2008) ("Accordingly, a jurisdiction will be deemed to have substantially implemented the SORNA standards with respect to sex offenders whose predicate convictions predate the enactment of SORNA or the implementation of SORNA in the jurisdiction's program if it registers these sex offenders, when they fall within any of the three classes described above, in conformity with the SORNA standards".)

## A. Text

The Pennsylvania Constitution provides, in pertinent part: "No ex post facto law ... shall be passed." PA. CONST. art. I §17. It is clear, as the Commonwealth argues, the text of the federal and state constitutions are nearly identical and we have recognized "the same pre-revolutionary-war concerns shaped the ex post facto provisions of the constitutions of Pennsylvania and the United States." *See Young*, 637 A.2d at 1317 n.7. However, "we are not bound to interpret the two provisions as if they were mirror images, even where the text is similar or identical." *Edmunds*, 586 A.2d at 895-96. Moreover, as *amicus* PACDL contends, the different location of the clauses within each document "speaks volumes." PACDL's Brief at 37. The location of Pennsylvania's clause within the Declaration of Rights lends considerable force to the argument it provides even more protection than its federal counterpart. *See Gondelman v. Commonwealth*, 554 A.2d 896, 904 (Pa. 1989) ("those rights enumerated in the Declaration of Rights are deemed to be inviolate and may not be transgressed by government"); *see also* PA. CONST. art. 1, §25 ("To guard against transgressions of the high powers which we have delegated, we declare that everything in this article is excepted out of the general powers of government and shall forever remain inviolate.").

## B. History

Appellant next argues the history of Pennsylvania's ex post facto clause, including relevant case law, also weighs in favor of finding it provides greater protection than its federal counterpart, despite the fact this Court declined to make this distinction in *Gaffney,* 733 A.2d at 616. In *Gaffney*, this Court held the retroactive application of Megan's Law I did not violate the state or federal ex post facto clauses. *Id.* at 621-22. Appellant distinguishes *Gaffney* by noting reputation interests were not at issue

because Gaffney's sexual offender registration information was not to be disseminated to the public under that statute. Appellant's Brief at 29, citing *Gaffney*, 733 A.2d at 621. Appellant argues this Court has recognized reputation as a protected interest in other contexts under state law, *see, e.g., Hatchard v. Westinghouse Broadcasting Co.*, 532 A.2d 346, 350 (Pa. 1987), and although the federal constitution does not provide such express protection of reputation rights, this Court recently recognized an individual's right to reputation may be encroached by sex offender registration laws that brand offenders with the "indelible mark of a dangerous recidivist." Appellant's Brief at 29, *quoting J.B.*, 107 A.3d at 17, 19 ("SORNA registration requirements, premised upon the presumption that all sexual offenders pose a high risk of recidivating, impinge upon juvenile offenders' fundamental right to reputation as protected under the Pennsylvania Constitution.").

Moreover, PACDL notes, the Pennsylvania ex post facto clause was adopted ten years prior to its federal counterpart, and Pennsylvania historically took a different approach towards punishment, diverting away from the nationally accepted view of corporal punishment as the norm much earlier than other jurisdictions. PACDL's Brief at 38-39, *citing* Robert R. Tyson, *Essay on the Penal Law of Pennsylvania*, Law Academy of Philadelphia 9-13 (1827). PACDL further argues the most significant difference between federal and state ex post facto case law is this Court has stated the two constitutions "afford separate bases for proscribing ex post facto laws." *Id.* at 39, *citing Lehman v. Pa. State Police*, 839 A.2d 265, 270 n.4 (Pa. 2003) (denial of firearm application based on prior conviction was not punishment and did not violate state or federal ex post facto clauses). Finally, PACDL asserts this Court, in its decisions discussing the ex post facto clause, has stated the seventh *Mendoza-Martinez* factor, excessiveness, may alone be dispositive of a punitive finding in Pennsylvania.

PACDL's Brief at 39, *citing Lee*, 935 A.2d at 876 n.24 (excessiveness alone might warrant finding Megan's Law II requirements are punitive); *Williams II*, 832 A.2d at 982-83 (leaving open possibility of excessiveness as determinative factor).

The Commonwealth responds by arguing historical considerations do not distinguish the state clause from its federal counterpart, and that this Court's statements regarding excessiveness standing alone to support a finding a statute has punitive effect do not undermine the United States Supreme Court's expression that no single *Mendoza-Martinez* factor is exhaustive or dispositive. *See Hudson*, 522 U.S. at 101. The Commonwealth also rejects appellant's reputation-based argument by noting *J.B.* was confined to the unique reputation concerns for juvenile offenders and does not apply to adults who have a higher likelihood of recidivating. Commonwealth's Brief at 46-47.

Although we acknowledge both the state and federal ex post facto clauses were shaped from the same pre-revolutionary war concerns, this Court has nevertheless noted divergence between the clauses in the past, particularly with regard to defining punishment on the basis of excessiveness. *See, e.g., Lee*, 935 A.2d at 876 n.24 ("There is some tension between the *Hudson* language [that no *Mendoza-Martinez* factor is controlling] and our own suggestion in [*Williams II*]*,* which postdated *Hudson* by over five years, that the last *Mendoza-Martinez* factor alone might render Megan's Law unconstitutional provided an adequate showing. We nonetheless suggested in [*Williams II*] and maintain now, if only *arguendo,* that a showing of sufficient excessiveness in Megan's Law II's [Registration, Notification, and Counseling] provisions might warrant a finding that those provisions are punitive."). We further find persuasive in our comparison of the history of the two ex post facto clauses the fact that the Pennsylvania Constitution includes reputation as a fundamental right, s*ee Hatchard*,

532 A.2d at 350, and conclude this factor militates in favor of holding the Pennsylvania clause is even more protective than its federal counterpart.

## C. Case Law from Other States

Appellant argues courts in Maryland, Indiana, and Alaska have considered the public's perception and treatment of sex offenders when holding such statutes are unconstitutional under their respective state constitutions, even in the absence of a reputation clause like Pennsylvania's which categorizes reputation as an inherent right. Appellant's Brief at 30-31, *citing Doe v. Dept. of Public Safety & Correctional Services*, 62 A.3d 123, 140 (Md. 2013) (sex offender statute's information dissemination provisions have same effect as public shaming); *Wallace v. State*, 905 N.E.2d 371, 380 (Ind. 2009) (aggressive notification provisions expose registrants to humiliation and ostracism); *Doe*, 189 P.3d at 1011-12 (offenders lost employment and moved out of marital homes due to fear of publication). The Commonwealth responds by arguing the majority of states have adopted the High Court's reasoning in *Smith* to uphold the retroactivity of their registration laws and only seven states have found such retroactive application to be unconstitutional under the ex post facto clauses of their state constitutions. Commonwealth's Brief at 47-48.

Although many states have adopted the reasoning of the *Smith* Court in upholding their sex offender registration statutes under both state and federal ex post facto clauses, we do not find this controlling. The Pennsylvania Constitution differs from the constitutions in those states—as well as the United States Constitution — in its treatment of, *inter alia*, the right to reputation. *See J.B.*, 107 A.3d at 16 ("This Court has recognized that the right to reputation, although absent from the federal constitution, is a fundamental right under the Pennsylvania Constitution.") (citations omitted). We further

find persuasive the fact that courts in Maryland, Indiana and Alaska, which have held retroactive application of sex offender registration laws violate ex post facto clauses under their state constitutions, have also found harm to the reputations of offenders to be a factor in their constitutional analysis, even in the absence of a constitutional provision like Pennsylvania's to give special protection to that interest. *See Doe v. Dept. of Public Safety*, 62 A.3d at 140; *Wallace*, 905 N.E.2d at 380; *Doe v. State*, 189 P.3d at 1011-12. We conclude this *Edmunds* prong weighs in favor of holding Pennsylvania's ex post facto clause provides more protection than the federal clause.

### D. Policy Considerations

Appellant argues policy considerations weigh in favor of finding greater protections in the Pennsylvania Constitution as the state has an interest in the finality of sentencing and individuals have an interest in understanding the regulatory outcome of guilty pleas and criminal convictions. Appellant's Brief at 31. Appellant further argues adult sex offenders have been found to recidivate at a rate of only 13% and public policy should favor the 87% of sex offenders who will never offend again, and provide security in the knowledge that no new penalties or regulations will be imposed after they have been convicted and sentenced. *Id.* at 31, *citing J.B.*, 107 A.3d at 17. In addition, PACDL again forwards reputation-based arguments to support the position public policy weighs in favor of finding greater protection in Pennsylvania's ex post facto clause. PACDL's Brief at 40-41. The Commonwealth contends appellant's argument regarding low recidivism rates relies on statements from *J.B.* regarding adult recidivism rates which have been rebutted. Commonwealth's Brief at 29-30, 49. The Commonwealth further argues although reputation is a constitutionally protected right in Pennsylvania, it

may be constrained, just like other rights, upon a qualifying criminal conviction and policy factors weigh in favor of protecting the public from sex offenders. *Id*. at 50-51.

As previously stated, we recognize there is conflicting evidence regarding recidivism rates of adult sex offenders, and therefore we do not base our determination regarding this prong of the *Edmunds* analysis on this aspect of the relevant policy considerations. *See e.g.*, *Hale*, 128 A.3d at 785 (where "substantial policy considerations" are involved "such matters are generally reserved … to the General Assembly"). However, we do find persuasive appellant's argument that both the state and offenders have an interest in the finality of sentencing, as well as the claim the Pennsylvania Constitution's special treatment of the right to reputation justifies greater protections under the Pennsylvania ex post facto clause. *See Commonwealth v. Russo*, 934 A.2d 1199, 1212 (Pa. 2007) (public policy considerations unique to Pennsylvania may suggest federal doctrines are inconsistent with Pennsylvania Constitution).

### E. Summary of *Edmunds* Analysis

To summarize, we find the following to be consequential to our analysis of the relative protections afforded by the state and federal ex post facto clauses: the right to be free from ex post facto laws is an "inherent" and fundamental Article I right under the Pennsylvania Constitution; this Court has previously recognized, in *Lee*, *Lehman*, and *Williams II*, there is some divergence between the state and federal ex post facto clauses; SORNA's registration and online publication provisions place a unique burden on the right to reputation, which is particularly protected in Pennsylvania; other states have also found the retroactivity of registration laws unconstitutional under their state constitutions, partly due to reputation concerns; and both the state and offender have an

interest in the finality of sentencing that is undermined by the enactment of ever-more severe registration laws. For those reasons, we find Pennsylvania's ex post facto clause provides even greater protections than its federal counterpart, and as we have concluded SORNA's registration provisions violate the federal clause, we hold they are also unconstitutional under the state clause.

## VII. Conclusion

We reverse the Superior Court's decision affirming appellant's judgment of sentence, and vacate that portion of the sentence requiring appellant to comply with SORNA.

Jurisdiction relinquished.

Justices Baer and Donohue join the opinion and Justices Todd and Wecht join Parts I through IV and VII of the opinion.

Justice Wecht files a concurring opinion in which Justice Todd joins.

Chief Justice Saylor files a dissenting opinion.

Justice Mundy did not participate in the consideration or decision of this case.