J-S41018-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RONALD SMITH, | : | |
| | : | |
| Appellant | : | No. 3502 EDA 2017 |

Appeal from the Judgment of Sentence June 15, 2017
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0004929-2016

BEFORE:   GANTMAN, P.J., OLSON, J., and STEVENS*, P.J.E.

MEMORANDUM BY OLSON, J.:                    **FILED AUGUST 23, 2018**

Appellant, Ronald Smith, appeals from the judgment of sentence entered on June 15, 2017, as made final by the denial of Appellant's post-sentence motion on September 29, 2017.  We *sua sponte* vacate the trial court's June 15, 2017 order, which found Appellant to be a sexually violent predator ("SVP"), and remand the case to the trial court for the sole purpose of issuing the appropriate notice under 42 Pa.C.S.A. § 9799.23 as to Appellant's tier-based registration obligations under SORNA.  However, in all other respects, we affirm.

The trial court provided us with a comprehensive and well-written summary of the facts and procedural posture of this case.  We thank the trial court and quote this section of the trial court's opinion at length:

> This case involves numerous instances of Appellant sexually abusing his two stepdaughters, juveniles S.A. and D.A, over the course of several years.  At the time of trial, S.A. and

_____
* Former Justice specially assigned to the Superior Court.

D.A. were tenth and ninth grade students[, respectively]. . . . [N.T. Trial, 1/10/17, at 5 and 220-221].

The following is a summary of S.A.'s testimony regarding the assaults against her. The first incident occurred when S.A. was six years old, and was living in a single room with two beds at the Neshaminy Inn in Bensalem, Bucks County, with her mother, two sisters, stepbrother, and the Appellant. [*Id.* at 5 and 9-11]. S.A. remembered that she was in kindergarten because a school bus picked her up at the Neshaminy Inn during that time. *Id.* at 10-11. The family lived in that motel room for just under one year. Appellant was S.A.'s mother's boyfriend during that time. *Id.* at 9-11. S.A. entered the bathroom of the motel room with the Appellant, and he shut the door and put his penis in her mouth while she was on her knees. *Id.* at 14-16.

About one year later, when S.A. was in the first grade, she and her family moved in with the Appellant's mother. . . . *Id.* at 17-18.  S.A. and her family would stay in the attic of the home, but they subsequently moved out in the summer following her fourth grade year. *Id.* at 17-20.

The second and third incidents occurred in the basement of [Appellant's mother's] home, while S.A. was in the first or second grade. [*Id.* at 25 and 28].  During the first incident, the Appellant shut the door and put his penis in S.A.'s mouth. [*Id.* at 25 and 27]. A few months later, the Appellant took S.A. into the basement and penetrated her with his penis, although she was unsure whether the intercourse was anal or vaginal at the time. [*Id.* at 28-29]. Subsequently, on three separate occasions, Appellant forced S.A. to perform oral sex upon his penis in the master bedroom. *Id.* at 32-33. Either before or after these encounters, Appellant told S.A. that he would "call CPS [Child Protective Services] or hurt mom." *Id.* at 35. Although S.A. did not understand the meaning of CPS at the time, the Appellant explained, "[t]hey would take us away." *Id.* at 35.  S.A. was afraid that the Appellant would hurt her mother or have her and D.A. taken away if she disclosed the sexual abuse. *Id.* at 36.

On a night towards the end of her stay at [Appellant's mother's house], Appellant drove S.A. to an "abandoned house" that belonged to his brother on Race Street, Bristol

Borough, Bucks County. *Id.* at 40. He took S.A. up to a room on the second floor, and engaged in anal intercourse with her on a box spring mattress. *Id.* at 44-45. At that time, S.A. knew that the Appellant had penetrated her anus and that it hurt. *Id.* at 45-46.

In the summer between S.A.'s fourth and fifth grade year, she, her family, and the Appellant moved down the street [to another house on Spruce Street]. *Id.* at 49. The family lived in that home for three years, until the October of S.A.'s eighth grade year; the victims and their younger sister again shared a bedroom in the attic of the home. [*Id.* at 51-52 and 56]. During that time, Appellant repeatedly called S.A. into his bedroom, pulled her head down towards his lap, and forced her to perform oral sex on his penis. *Id.* at 53-57. This occurred over twenty times in that same bedroom. *Id.* at 54-57. The Appellant would shut the door each time, and threatened to hurt S.A.'s mother if she disclosed the abuse. *Id.*

The next assault occurred on a Saturday before Christmas. S.A. remembered that it was Christmas because the living room had a Christmas tree and because her mother took her sisters and stepbrother to "Shop with a Cop." *Id.* at 67. S.A. was lying on her stomach in the middle of that living room floor. After the Appellant locked the front and rear doors to the home, he engaged in anal intercourse with her. *Id.* at 68-71. Appellant reiterated that he would hurt S.A.'s mother if she disclosed the assault. *Id.* at 71. An additional incident occurred one night in the attic while S.A. was sleeping on her bed. S.A. remembered that it was the night before her birthday because the Appellant gave her three chocolate eggs the following morning. *Id.* at 79. The Appellant lay down behind her while she was sleeping on her side. *Id.* at 75. As she lay on her side, S.A. pretended to sleep while the Appellant used his hand to rub the area around her vagina above her clothing. *Id.* at 75-78.

S.A. also described several incidents that occurred in the parking lot of Silver Lake Park in Bristol Borough, Bucks County. On at least five separate occasions, the Appellant would drive S.A. in his truck to the park during the day and park away from other cars. *Id.* at 95. The Appellant would pull down his pants and force S.A., who was in the passenger

seat, to bend over the center console and perform oral sex on his penis. *Id.* at 91-96. During the same time period, the Appellant began to abuse S.A.'s younger sister, juvenile D.A, who also testified at trial. D.A. testified that she was cleaning her room . . . when the Appellant called her to come down to his bedroom. *Id.* at 240. There, Appellant told D.A. to lock the bedroom door behind her and sit on the bed beside him. He told her, "just remember that I have guns." [*Id.* at 240-241]. Appellant then pulled out his penis, pushed D.A.'s head onto his lap, and forced her to perform oral sex on his penis. [*Id.* at 242].

A second incident with D.A. occurred a few weeks later in the same bedroom. D.A. was already in the room watching television when the Appellant walked in and locked the bedroom door. *Id.* at 245. Appellant sat next to her on the bed and said, "you have to do this for me or people you love are going to get hurt." *Id.* at 246. He then pulled out his penis, pushed D.A.'s head onto his lap, and forced her to perform oral sex on his penis to the point of ejaculation. *Id.* The Appellant cleaned up his ejaculate by wiping it on his pants. *Id.* D.A. did not disclose these incidents because the Appellant told her not to do so, and because she was afraid of him. *Id.* at 247.

Both victims described an incident when the Appellant abused them simultaneously. S.A. testified that she and D.A. were grounded when the Appellant called them into his bedroom, ostensibly to "unground" them. *Id.* at 86-87. When she and her sister arrived in the bedroom, Appellant told one of them to lock the door and instructed them to sit on either side of him. *Id.* at 249. S.A. testified that Appellant was seated on the bed, while D.A. testified that Appellant sat in a computer chair between the two sisters. *Id.* at 88-90, 249. The Appellant then pulled out his penis and said, "you guys know what to do." *Id.* at 250. The Appellant forced both S.A. and D.A. to perform oral sex on his penis; he forced S.A. to go first, and then told D.A. to perform the same act after a few minutes. [*Id.* at 89-90 and 250]. S.A. testified that the Appellant sexually abused her and her sister simultaneously "a little more than three" times, while D.A. testified that this act occurred only once. [*Id.* at 91-92, 251 and 257]. S.A. testified that the two sisters discussed the abuse and promised each other that they would not disclose it. *Id.* at

102. S.A. further stated that the Appellant and her mother had a "violent relationship" and that she feared that the Appellant would hurt her mother if she disclosed any abuse. *Id.* at 102-103.

The final incident with S.A. occurred on Halloween during her eighth grade year. She, her sisters and mother were moving out of the [] Spruce Street home that day because her mother had ended her relationship with the Appellant. *Id.* at 98-101. While the rest of the family moved their belongings into the car, Appellant forced S.A. to perform oral sex on his penis in the master bedroom. *Id.* at 98-100.

The victims eventually disclosed the abuse shortly after moving out of [the Spruce Street home]. S.A., a ninth-grader at the time, was at the Oxford Valley Mall in Bucks County with her mother, sisters, stepbrother, and Tasha Davis, a family friend and neighbor. *Id.* at 103-105. Ms. Davis testified that she had previously observed S.A. fidget with her sweatshirt, suck her thumb, and become "very agitated" when anyone would speak about the Appellant in her presence. *Id.* at 260-261. When the Appellant telephoned S.A.'s mother at the Oxford Valley Mall, Ms. Davis observed that S.A. became angry while listening to the conversation. This observation "raised a really big red flag" for Ms. Davis, and prompted her to invite S.A. to her apartment to speak privately. *Id.* at 262-264. Ms. Davis expressed her suspicions to S.A., and asked her if she had ever been touched by anyone. [*Id.* at 106-107 and 264]. At first, S.A. did not want to disclose the abuse because she promised her sister that she would not, but she eventually disclosed to Ms. Davis that the Appellant had abused her. [*Id.* at 106-107 and 265-266]. S.A. cried and shook during the approximately one-and-one-half hour conversation. [*Id.* at 108 and 266].

With S.A.'s permission, Ms. Davis invited S.A.'s mother to the apartment, followed by D.A. *Id.* at 268-269. After disclosing the abuse to her mother, S.A. told D.A. that it was "okay to say something now [be]cause it's already out." *Id.* at 112. At first, D.A. said that nothing happened to her. *Id.* at 269. After Ms. Davis repeatedly questioned her about whether the Appellant had touched her, D.A. finally disclosed that he did. *Id.* at 254. Ms. Davis testified that D.A. was only able to discuss the abuse a few months after that initial conversation,

and that her affect was "very flat" throughout those conversations. *Id.* at 269-270. Both victims testified that they were afraid to disclose the abuse and had difficulty discussing the incidents. [*Id.* at 109-111, 113, and 255].

Following this disclosure, Detective William Davis of the Bristol Borough Police Department referred the victims for interviews at the Children's Advocacy Center in Fairless Hills, Bucks County. *Id.* at 133. Detective Davis subsequently obtained permission from S.A. to perform a "cellphone takeover," in which he would portray himself as S.A. and, using her cellphone, contact the Appellant via text message to elicit a conversation. *Id.* at 135. On May 17, 2016, and June 9, 2017, Detective Davis used S.A.'s cellphone to contact the Appellant by text message and attempted to elicit a conversation regarding the sexual abuse. Screenshots of the text messages were admitted into evidence. *Id.* at 135-157.

Following the initial cellphone takeover, Detective Davis, along with Lieutenant Robert Gorman of the Bucks County Detectives, attempted to use S.A.'s cellphone to place a recorded phone call to the Appellant. *Id.* at 212. On May 17, 2016, S.A. placed a recorded phone call to the Appellant. [*Id.* at 218-219; Commonwealth Exhibit 38]. In response to a discussion regarding a doctor's visit for her sister, S.A. said, "You know what you did though." *Id.* The Appellant responded, "I don't remember what you're talking about," and told S.A. that he would call her back. *Id.* Before he hung up, the Appellant said, "they're setting me up for the kill." *Id.* When the Appellant failed to return her call, S.A. attempted to place three additional phone calls to the Appellant over the next several weeks, but they went unanswered. *Id.* at 213-215.

Bristol Township Detective Timothy Fuhrmann subsequently obtained a search warrant to extract logical data, including text messages, from the Appellant's cellphone. *Id.* at 175-178. On October 21, 2016, Detective Fuhrmann conducted the extraction and downloaded the cellphone's data. *Id.* at 191. Using search terms based on S.A.'s first name, Detective Fuhrmann searched for all voice and text communications between Appellant and S.A. on the cellphone; the extraction report did not yield any text message communications

between Appellant and S.A. on either May 17, 2016, or June 9, 2016. [*Id.* at 185-186 and 191-193]. Detective Fuhrmann testified that, in light of the previously conducted cellphone takeover, the absence of these text messages on those dates indicated that the cellphone operator deleted the text messages. *Id.* at 194.

. . .

Bristol Borough Police arrested and charged Appellant on June 13, 2016. On January 9, 2017, [the trial c]ourt entertained pre-trial motions regarding the admissibility of expert testimony. On January 7, 2017, Appellant moved to preclude expert testimony offered by the Commonwealth regarding child sex abuse. Specifically, Appellant acknowledged that the Commonwealth intended to call this expert for two purposes: first, to offer medical testimony, and, second, to offer testimony regarding a child's behavior in response to sexual abuse. [N.T. Hearing, 1/9/17, at 10-11]. Appellant affirmed that he was not seeking to preclude the expert's medical testimony as part of his pre-trial motion. *Id.* at 11.

In response, the Commonwealth argued that the expert witness would testify regarding victim responses and reactions to sexual assault pursuant to [42 Pa.C.S.A. § 5920. *Id.* 12-13 and 15]. Appellant argued that [the trial court] should exclude the testimony because it would improperly bolster the Commonwealth witness' credibility, because the proffered testimony was not specialized knowledge requiring an expert opinion, and because the testimony would be more prejudicial than probative. *Id.* at 11. The Commonwealth responded that the expert would limit her testimony to whether certain general behaviors of victims are consistent with sexual assault. *Id.* at 15-17. [The trial court] subsequently denied Appellant's motion. *Id.* at 17.

At trial, the Commonwealth offered the expert testimony of Dr. Maria McColgan, a child abuse pediatrician. [N.T. Trial, 1/11/17, at 11-12]. Dr. McColgan testified that she was certified as a child abuse pediatrician and general pediatrician by the American Board of Pediatrics since 2009, and that she personally performed 300 to 400 child sexual abuse examinations per year. *Id.* at 13, 21. Dr. McColgan further

testified that she oversaw several thousand other child sexual abuse examinations performed by other doctors, nurses and nurse practitioners over the course of her career. *Id.* She described her teaching and publishing experience, and stated that she testified as an expert witness in over 300 cases in various Pennsylvania county courts. *Id.* at 14-15. Finally, Dr. McColgan testified that, in addition to observing and performing frequent child abuse examinations, she received a significant amount of training in the dynamics of sexual abuse, children's responses to sexual abuse, and the impact of sexual abuse on children. *Id.* at 25-26. [The trial court] subsequently received Dr. McColgan as an expert in child abuse pediatrics, general pediatrics, the dynamics of sexual violence, and victim responses to sexual abuse. *Id.*

Dr. McColgan first testified to administering a comprehensive physical examination of each child, including a genital examination, at the Child Protection Program at St. Christopher's Hospital in Philadelphia. *Id.* at 28-32. There, Dr. McColgan supervised Elizabeth Grund, the nurse practitioner that performed the physical examinations, and subsequently reviewed Ms. Grund's report. *Id.* at 31. Dr. McColgan testified that both physical examinations were "normal," meaning that neither examination yielded any evidence of injury or scarring to the genitals, anus, or mouth. *Id.* at 32-36. Specifically, based on D.A.'s allegations of performing oral sex three separate times, Dr. McColgan testified that she would not expect to see any physical injuries during the examination due to the delay in disclosure and the physical characteristics of the mouth:

> MS. VAUGHAN: Now, Doctor, I think we began discussing [D.A.]. [D.A.] has been here and testified that on three separate occasions she was required by [Appellant] to perform oral sex on him. Based on that information, would you expect [D.A.] to have any physical injuries?
>
> DR. MCCOLGAN: No.
>
> MS. VAUGHAN: And why is that?
>
> DR. MCCOLGAN: Because several reasons. First of all, oral penetration doesn't typically lead to physical trauma. It can lead to other forms of trauma, but not typically

- 8 -

physical trauma. And with oral penetration, sometimes we can see petechia[,] which are little teeny, tiny bruises to the back of the mouth, but even if they are there they would go away within hours to days. Anybody who knows that any injury inside of your cheek, if you have injury, it typically heals really, really quickly. You can actually, you know, bite the inside of your cheek pretty significantly, and within a couple days it heals without any signs of scarring. That's because of the type of tissue that it is. And so in these children's case, the disclosure of sexual abuse, there was a delay in the time between the last episode of sexual abuse and the examinations, and so any injury that might have been there, even though it's pretty unlikely that there would have been injury from oral penetration would have healed in that time frame.

*Id.* at 36-37. Additionally, in light of S.A.'s allegation that the Appellant either anally or vaginally penetrated her with his penis when she was approximately ten years old, Dr. McColgan again testified that she would not expect to see any physical injuries for the same reasons:

MS. VAUGHAN: Now, [S.A.] has been here, Doctor, and testified that as to one instance when she was at best ten years old to anal or vaginal intercourse, she couldn't tell because she didn't know I think what was happening. Would you expect any injury based on that report?

DR. MCCOLGAN: No.

MS. VAUGHAN: And why is that?

DR. MCCOLGAN: Again, the majority of children who have been sexually abused, even when there's vagina or anal penetration, have normal examinations, and that's for a long list of reasons.

The first, as we already mentioned, is the delay in disclosure and the subsequent delay in the time the medical examination is done since the last time anything occurred. I already explained to you that the tissues of the genital structures and the anus are similar to the tissues of inside of your cheek. If there is any injury at all, it heals very quickly, and oftentimes, the vast majority

of the times, without any scar at all. So that plays a big role in why the exam would be perfectly normal.

Second of all, the tissues of the anus are meant to stretch significantly. That's how we pass a stool. Anybody who has seen a small two year old, for example, go to the bathroom and you look in the toilet and go, oh my God, how could that possibly have come out of him, but if you look at their anus, you know, two minutes later there's no injury. Those tissues are meant to stretch. It's designed to stretch. If something can come out without injury, then something can go in without significant injury.

The tissues of the genital structures, in [S.A.]'s case she got her period when she was about 12 years old, which means that when she was ten she probably was already starting to go through puberty, and so as you already heard, if she didn't know if it was in the anus or the vagina, it's -- that's not uncommon in that age group. Children will say in and not exactly know where it goes. And, in fact, most adult women don't really know, you know, their genital anatomy very well unless you've actually looked down there so that's not surprising that she may not know where it went, she just knows that something – that it was down there. Oftentimes, too, when a child says it was in, there's types of sex called vulvar coitus and gluteal coitus. That's where the male rubs their penis in between the labia majora and labia minora, and it may go through the hymen somewhat but maybe not all the way through the hymen like adult sex or it may be rubbed in between the butt cheeks and go into the anus either partially or fully, but to that child it's still in. It's still in their genito-anal structures. And so for all of those reasons we wouldn't expect to see any findings.

And, furthermore, once you start to go through puberty, as I said earlier, the hymen becomes sort of more stretchy, kind of like a scrunchy, and you wouldn't necessarily see injury even if there was penetration.

*Id.* at 41-44. Dr. McColgan noted that, generally, she only finds injury in less than five percent of cases of anal or vaginal penetration of a child. *Id.* at 44.

- 10 -

In conclusion, Dr. McColgan opined that the results of S.A.'s physical examination were consistent with her allegation that Appellant anally penetrated her three times prior to the age of twelve:

> MS. VAUGHAN: And so could you tell us, to a reasonable degree of medical certainty, if [S.A.]'s report that she was forced to have anal sex with the defendant three times prior to the age of 12 is consistent with her physical examination?
>
> DR. MCCOLGAN: Yes, it's completely consistent.

*Id.* at 44-45. She further opined that the results of D.A.'s physical examination were consistent with her allegation that Appellant forced her to perform oral sex on him:

> MS. VAUGHAN: Doctor, if we could move to-well, does the lack of physical injury on [D.A.], I think that's where we started, mean that she was not forced to have oral sex with the defendant?
>
> DR. MCCOLGAN: No
>
> MS. VAUGHAN: And so is the lack of physical injury consistent with her account of what happened to a degree of reasonable medical certainty?
>
> DR. MCCOLGAN: Yes, of course.

*Id.* at 40-41. On cross-examination, Dr. McColgan testified that the absence of injury to both victims was also consistent with "nothing ever happening:"

> MS. JANNETTI: Okay. And essentially you are aware-one moment, Your Honor that the allegation would be that there was multiple instances of anal intercourse; is that correct, with [S.A.]?
>
> DR. MCCOLGAN: Yes.
>
> MS. JANNETTI: And that she experienced bleeding and pain as a result. Is that correct?

DR. MCCOLGAN: Yes.

MS. JANNETTI: And it's your testimony that the absence of that injury basically means nothing?

DR. MCCOLGAN: No, I didn't say it basically means nothing.

MS. JANNETTI: Well, if I can just clarify for myself, you're saying that it could mean that the-it's consistent with what she's saying?

DR. MCCOLGAN: Yes.

MS. JANNETTI: But it could also be consistent with nothing ever happening?

DR. MCCOLGAN: Yes.

*Id.* at 55-56. Finally, Dr. McColgan testified that sexual abuse with anal penetration could be one of the causes, among many, of S.A.'s reported constipation prior to the age of 12. *Id.* at 46.

Regarding victim responses to sexual abuse, Dr. McColgan testified generally that the majority of children delay disclosure of abuse, and described several reasons for this delay, including fear, embarrassment, and guilt. *Id.* 37-39. She also testified that, "more than 90 percent of the time," the abuser is well known to the child victim, which results in the child continuing to see or visit their abuser even after an assault. *Id.* at 38-40, 46-47. She opined that the above factor further contributes to a child's delayed disclosure. *Id.* at 38-40. Dr. McColgan also testified that it was common for child victims to engage in piecemeal disclosures of abuse over time, and noted that she has seen "every range of emotional affect" in child victims when confronted with disclosure, including outright denial. *Id.* at 47-50.

The Commonwealth additionally offered the testimony of Lieutenant Gorman regarding his role in diagraming and photographing the interiors of the . . . homes [where the abuse occurred.  N.T. Trial, 1/9/17, at 57-58]. Both victims'

- 12 -

recollections of the then-existing furniture and appearances of the rooms in which the abuse occurred were consistent with the various diagrams and photographs taken by Lieutenant Gorman. [*Id.* at 66, 68, 74, 80, 82-83, and 90; N.T. Trial, 1/10/17, at 21, 36-40, 61-65, 69, 81-83, 85, 227-230, and 233-238].

Appellant offered the expert testimony of Dr. William L. Manion, a forensic pathologist. [N.T. Trial, 1/11/17, at 61-65]. Dr. Manion[] testified that the majority of his experience involved performing autopsies on deceased adults and children, and that he has not physically examined a living child since his pediatric rotation in medical school. *Id.* at 73-74. He opined that he would expect to see some kind of injury, scarring or laceration of some kind in nearly every case of child sexual abuse involving anal penetration of the child. [*Id.* at 77-79 and 88-89].

Finally, Appellant's daughter testified on his behalf. She resided with the Appellant and two victims in the same room at the Neshaminy Inn [and the Spruce Street houses] during the same period of time the victims described. *Id.* at 96-100. She testified that she did not witness or otherwise have knowledge of any inappropriate behavior between Appellant and the two victims during that time. *Id.*

After a three-day trial, a jury found Appellant guilty of the following crimes: three counts of rape of a child, seven counts of involuntary deviate sexual intercourse with a child less than 13 years of age, involuntary deviate sexual intercourse with a person less than 16 years of age, indecent assault of a person less than 13 years of age, and indecent assault of a person less than 16 years of age.[1] On June 15, 2017, [the trial] court sentenced Appellant to an aggregate [term of] 30 to 80 years' incarceration. [Further, that same day, the trial court determined that "the Commonwealth has met its burden in establishing that [Appellant] does meet the criteria to be classified as a sexually violent predator." N.T. Sentencing, 6/15/17, at 57]. Appellant filed a timely Motion

---

[1] 18 Pa.C.S.A. §§ 3121(c), 3123(b), 3123(a)(7), 3126(a)(7), and 3126(a)(8), respectively.

to Reconsider Sentence on June 23, 2017, which [the trial] court denied after a hearing on September 29, 2017. Appellant filed a timely notice of appeal to the Superior Court on October 26, 2017.

Trial Court Opinion, 3/23/18, at 1-14 (internal footnotes and some internal capitalization omitted).

Appellant raises one claim on appeal:

Was it an error to admit testimony by the Commonwealth's expert which improperly bolstered the testimony of the victims and was premised on the expert's apparent acceptance of the children's report[?]

Appellant's Brief at 5.

"The admission of evidence is committed to the sound discretion of the trial court and an appellate court may reverse only upon a showing that the trial court clearly abused its discretion." ***Commonwealth v. McFadden***, 156 A.3d 299, 309 (Pa. Super. 2017) (internal quotations and citations omitted). This standard of review is a narrow one. ***Commonwealth v. Mendez***, 74 A.3d 256, 260 (Pa. Super. 2013) (citation omitted). Our case law holds that "[a]n abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." ***Id.***

Appellant claims that the trial erred when it permitted the Commonwealth's expert, Dr. Maria McColgan, to testify: 1) that the "lack of physical injury is consistent with [both S.A. and D.A.'s] account[s] of what happened" and 2) "that it is common for there to be a delay in the reporting

- 14 -

of sexual abuse and the reasons why various victims may delay their disclosures." Appellant's Brief at 14-15. We will consider Appellant's two sub-claims in the order presented above.

First, Appellant claims, the trial court erred when it allowed Dr. McColgan to testify that the "lack of physical injury is consistent with [both S.A. and D.A.'s] account[s] of what happened." Appellant's Brief at 14. The trial court found this claim waived, as Appellant failed to raise the issue in his pre-trial motion and Appellant did not object to Dr. McColgan's testimony at trial. **See** Trial Court Opinion, 3/23/18, at 20. We agree that Appellant has waived this claim on appeal.

Pursuant to Pennsylvania Rule of Appellate Procedure 302, "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). With respect to evidentiary rulings, "[e]rror may not be predicated upon a ruling that admits [ ] evidence unless . . . a timely objection, motion to strike[,] or motion *in limine* appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." Pa.R.E. 103(a)(1).

Appellant's motion *in limine* requested that the trial court preclude any testimony from the Commonwealth's expert that dealt with "victim responses to sexual abuse and the impact of sexual abuse on victims during and after being assaulted." Appellant's Pre-Trial Motion, 1/5/17, at 1. Appellant claimed that this testimony was inadmissible for a number of reasons,

including that it would "improperly bolster the credibility of the Commonwealth's witnesses." *Id.* at 2.

On January 9, 2017, the trial court heard oral argument on Appellant's motion *in limine* and, at the beginning of the argument, Appellant's counsel clarified the scope of her objection. Counsel declared:

> Your Honor . . . , [i]t's my understanding that the Commonwealth's expert would be called for two purposes: **one for medical testimony, which is not a part of this motion, but we are seeking to exclude her testimony regarding the child's behavior in response to sexual abuse**. We believe that this improperly bolsters the credibility of the Commonwealth's witness, specifically the victims that would be testifying in this case.

N.T. Oral Argument, 1/9/17, at 10-11 (emphasis added).

The trial court denied Appellant's motion, but informed Appellant's counsel that, "if you think the [questions] are beyond what the expert can opine under the current state of the law, you'll object." *Id.* at 15.

As noted, during trial, Dr. McColgan testified that she reviewed the reports from S.A. and D.A.'s medical examinations and testified that both S.A. and D.A. had "normal" genital examination results. N.T. Trial, 1/11/17, at 31. Further, Dr. McColgan testified that "the lack of physical injury [was] consistent with [both S.A. and D.A.'s] account[s] of what happened." *Id.* at 40-41 and 44-45. Appellant did not object to any of this testimony. *See id.*

Therefore, since Appellant failed to object to Dr. McColgan's testimony that "the lack of physical injury [was] consistent with [both S.A. and D.A.'s] account[s] of what happened" and, since Appellant's motion *in limine* did not

encompass Dr. McColgan's medical testimony, but was limited to her testimony regarding victim "behavior in response to sexual abuse," Appellant waived any claim that the trial court erred in permitting Dr. McColgan to testify that the "lack of physical injury is consistent with [both S.A. and D.A.'s] account[s] of what happened." Appellant's Brief at 14; *see also* Pa.R.E. 103(a)(1).

Next, Appellant claims that the trial court erred when it allowed Dr. McColgan to testify "that it is common for there to be a delay in the reporting of sexual abuse and the reasons why various victims may delay their disclosures." Appellant's Brief at 14-15. Appellant claims that this testimony was inadmissible because it "indirectly vouch[ed] for the reports of the victims" and "improperly invaded [] the jury's province to determine the credibility of the Commonwealth's witnesses." *Id.* Appellant's claim fails.

42 Pa.C.S.A. § 5920, entitled "expert testimony in certain criminal proceedings," provides:

> (a) Scope.--This section applies to all of the following:
>
> > (1) A criminal proceeding for an offense for which registration is required under Subchapter H of Chapter 97 (relating to registration of sexual offenders).
> >
> > (2) A criminal proceeding for an offense under 18 Pa.C.S. Ch. 31 (relating to sexual offenses).
>
> (b) Qualifications and use of experts.--
>
> > (1) In a criminal proceeding subject to this section, a witness may be qualified by the court as an expert if the witness has specialized knowledge beyond that possessed

by the average layperson based on the witness's experience with, or specialized training or education in, criminal justice, behavioral sciences or victim services issues, related to sexual violence, that will assist the trier of fact in understanding the dynamics of sexual violence, victim responses to sexual violence and the impact of sexual violence on victims during and after being assaulted.

(2) **If qualified as an expert, the witness may testify to facts and opinions regarding specific types of victim responses and victim behaviors**.

(3) The witness's opinion regarding the credibility of any other witness, including the victim, shall not be admissible.

(4) A witness qualified by the court as an expert under this section may be called by the attorney for the Commonwealth or the defendant to provide the expert testimony.

42 Pa.C.S.A. § 5920 (internal footnote omitted) (emphasis added).

The trial court accepted Dr. McColgan as an expert in "child abuse pediatrics, general pediatrics, and the dynamics of sexual violence and victim responses to sexual abuse." N.T. Trial, 1/11/17, at 26. Further, as the trial court explained, Section 5920 expressly allowed Dr. McColgan to testify "that it is common for there to be a delay in the reporting of sexual abuse and the reasons why various victims may delay their disclosures" because Dr. McColgan "testified generally regarding common child victim responses to sexual abuse" and she "did not testify regarding any specific victim responses exhibited by S.A. or D.A. in this case." Trial Court Opinion, 3/23/18, at 18-19. Therefore, in accordance with Section 5920(b)(2) and (3), since Dr. McColgan "testif[ied] to facts and opinions regarding specific types of victim

responses and victim behaviors" – and did not provide an "opinion regarding the credibility of . . . the victim[s]" – Dr. McColgan's expert testimony was admissible and the trial court did not err in denying Appellant's motion *in limine*.

Before concluding our analysis, however, we are constrained to *sua sponte*[2] raise the legality of Appellant's designation as an SVP under the Sex Offender Registration and Notification Act (SORNA), 42 Pa.C.S.A. §§ 9799.10-9799.41. A recent panel of this Court recognized:

> In [**Commonwealth v. Muniz**, 164 A.3d 1189 (Pa. 2017)], our Supreme Court held that the registration requirements under SORNA constitute criminal punishment. **Id.** at 1218. In light of **Muniz**, this Court determined: "Under **Apprendi v. New Jersey**, 530 U.S. 466 (2000) and **Alleyne v. United States**, 570 U.S. 99 (2013) a factual finding, such as whether a defendant has a mental abnormality or personality disorder that makes him . . . likely to engage in predatory sexually violent offenses, that increases the length of registration must be found beyond a reasonable doubt by the chosen fact–finder." **Commonwealth v. Butler**, 173 A.3d 1212, 1217 (Pa. Super. 2017) (internal quotations and citations omitted). The **Butler** Court further held "section 9799.24(e)(3) of SORNA violates the federal and state constitutions because it increases the criminal penalty to which a defendant is exposed without the chosen fact–finder making the necessary factual findings beyond a reasonable doubt." **Id.** at 1218. The Court therefore concluded that trial courts no longer can designate convicted defendants as SVPs or hold SVP hearings "until our General Assembly enacts a constitutional designation mechanism." **Id.** The **Butler** Court directed trial courts to apply only the applicable tier–based registration period, as those periods apply based on the

---

[2] **See Commonwealth v. Butler**, 173 A.3d 1212 (Pa. Super. 2017) (addressing legality of SVP status *sua sponte*).

conviction itself, and not due to any additional fact not found, under SORNA's procedures, by the fact–finder. The Court ultimately reversed the order finding the defendant to be an SVP and remanded to the trial court for the sole purpose of issuing appropriate notice of the defendant's tier–based registration period. ***Id.***

***Commonwealth v. Golson***, \_\_\_ A.3d \_\_\_, 2018 WL 2473514, at \*7 (Pa. Super. 2018) (some internal corrections omitted).

Here, the trial court designated Appellant an SVP on June 15, 2017. N.T. Sentencing, 6/15/17, at 57. In light of ***Butler*** and our Supreme Court's decision in ***Muniz***, as summarized above, we are constrained to vacate the portion of the trial court's order of June 15, 2017 designating Appellant as an SVP. We remand the case to the trial court for the sole purpose of issuing the appropriate notice under 42 Pa.C.S.A. § 9799.23 as to Appellant's tier-based registration obligations under SORNA.

Judgment of sentence affirmed in part, SVP designation vacated. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/23/18